936 P.2d 421 (1997)
86 Wash.App. 280
Robert A. THOMPSON, Appellant,
v.
Ronald KATZER, and Ann Katzer, husband and wife, and Buell Berg, individually, and as the agent of Ronald and Ann Katzer, Respondents.
No. 19257-8-II.
Court of Appeals of Washington, Division 2.
May 9, 1997.
*422 James Paul Murphy, Hoffman Hart & Wagner, Kirkland, Janet M. Schroer, and Jeffrey Richard Street, Hoffman Hart & Wagner, Portland, for Respondents.
James Kieran Morgan, Longview, for Appellant.
MORGAN, Judge.
Robert A. Thompson, the stepson of Buell Berg, sued for personal injuries sustained by slipping on ice and snow in the driveway of a house at which Berg was house-sitting. At the end of the plaintiff's case-in-chief, the trial court granted the defendants' motion to dismiss for insufficient evidence. We affirm.
In early 1991, Buell Berg was house-sitting for some friends, Ronald and Ann Katzer, who were away on vacation. The Katzers' house was near Ariel in rural Cowlitz County. Berg's car, however, was parked at Thompson's home in Vancouver, Washington.
At the times material here, the Katzers' driveway was covered with ice and snow. According to Thompson, the driveway was so slick that four people slipped or fell before he did. Although Berg knew of at least one fall, he took no action to remove the ice and snow. Nor did he post a warning about it.
Several days after the driveway was first covered with ice and snow, Berg asked Thompson to bring him his car. Berg said he would pay for gas, but no other consideration was bargained for or promised.
Responding to Berg's request, Thompson drove Berg's car from Vancouver to Ariel. Thompson's brother followed in a second vehicle, so Thompson would have a ride back to Vancouver.
Thompson and his brother set out after dark. Most of the way, the roads were dry and clear. When they arrived at the Katzers', however, they found, in Thompson's *423 words, that the driveway "was solid snow then, solid totally, and I went upI went on ahead up, and I knew it was getting pretty bad."[1] At the top of the driveway, Thompson parked, got out, and began walking back toward his brother. He then slipped, fell, and injured his knee.
In December 1993, Thompson sued both Berg and the Katzers, alleging that he was an invitee on the Katzers' property; that Berg owed him a duty of reasonable care; and that Berg had breached that duty. He also alleged that the Katzers were vicariously liable for Berg's breach because Berg was their agent.
In December 1994, Thompson sought an order declaring that Berg was the Katzers' agent as a matter of law. The trial court granted the order, which both parties now accept for purposes of this appeal.
In February 1995, the case went to trial. Thompson testified that he had fallen in the Katzers' driveway in the manner described above. He said the driveway had been covered by ice, on top of which was a thin layer of snow, and that the layer of snow had deceived him into thinking he could walk on the driveway even though he knew, from driving up the driveway, that the ground was "slick."[2] He opined that his act of delivering Berg's car to Ariel had an economic value of about twenty dollars, but he did not assert that such value had been bargained for or promised.
At the end of Thompson's case-in-chief, Berg and the Katzers moved for dismissal. They argued that Thompson was a licensee as a matter of law, and that Berg had not breached the standard of care owed to a licensee. Agreeing, the trial court granted the motion and dismissed the case. Thompson then filed this appeal, in which he claims (1) that he was an invitee rather than a licensee, and (2) that even if he was a licensee, he produced evidence sufficient to show a breach of the applicable standard of care.

I
"Common law classifications continue to determine the duty owed by an owner or occupier of land in Washington."[3] The classifications pertinent here are invitee and licensee.[4] If the evidence and inferences taken in the light most favorable to Thompson show that he could not have been an invitee, we should affirm the trial court's ruling that he was a licensee.[5]
"An invitee is either a public invitee or a business visitor."[6] "A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public."[7] "A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land."[8]
In contrast, a "licensee" enters the occupier's premises with the occupier's permission *424 or tolerance, either (a) without an invitation or (b) with an invitation but for a purpose unrelated to any business dealings between the two.[9] The term "licensee" includes, at a minimum, (1) persons who come on the land solely for purposes of their own, (2) members of the occupier's household (except a boarder, servant or other person whose relationship with the occupier is primarily economic), and (3) social guests.[10]
The explanation usually given ... for the classification of social guests as licensees is that there is a common understanding that the guest is expected to take the premises as the possessor himself uses them, and does not expect and is not entitled to expect that they will be prepared for his reception, or that precautions will be taken for his safety, in any manner in which the possessor does not prepare or take precautions for his own safety, or that of the members of his family.[[11]]
The problem in this case is whether Thompson was a business visitor or a licensee. He could not have been a public invitee, because the Katzers' land was not held open to the public.
Thompson argues he was a business visitor because his act of driving Berg's car to Ariel had economic value. He also may be relying on Berg's agreement to pay for gas. Berg and the Katzers argue that his purpose was not connected with business dealings, but rather was familial or social. Thus, they say, he was a licensee.
Thompson's argument rests on the assertion that whenever an entrant bestows an economic benefit on the occupier, the entrant is automatically a business visitor. We agree that the bestowing of an economic benefit is an important factor to consider when deciding whether an entrant is an invitee or licensee, and that one who bestows such benefit may be a business visitor. It does not follow, however, that the bestowing of an economic benefit is dispositive, or that one who bestows such benefit is always a business visitor. The ultimate goal is to differentiate (1) an entry made for a business or economic purpose that benefits both entrant and occupier, from (2) an entry made for a purpose that either (a) benefits only the entrant or (b) is primarily familial or social. Accordingly, an entrant will not be a "business visitor," even when he or she confers an economic benefit, if there is no "real or supposed mutuality of interest in the subject to which the visitor's business or purpose relates,"[12] or if the benefit is merely incidental to an entry that is primarily familial or social.[13] If the law were otherwise, every guest who brings a bottle of wine to the host of a residential dinner party would be a "business visitor," and the distinction between invitees and licensees, recently reaffirmed by the Supreme Court,[14] would be obliterated.
Younce v. Ferguson[15] illustrates. In that case, the teenage son of a farm family invited his high school classmates onto the land for a graduation party. He charged $4 per person to cover the cost of beer, food and music. Lisa Younce and Tamera Ferguson were two of the attendees. While the party *425 was in progress, Younce was struck and injured by a car driven by Ferguson. When Younce sued the parents/landowners, the trial court found she was a social guest, and therefore a licensee, despite the fact she had conferred an economic benefit by paying the $4 admission fee. The Supreme Court affirmed, apparently holding that Younce entered primarily for social purposes, and that the economic benefit from the $4 fee was merely incidental to those purposes.[16]
Swanson v. McKain[17] further illustrates. In that case, the plaintiff and others were invited to a beachfront cabin by the adult daughter of its owners. The plaintiff brought firewood at the daughter's request, fixed a leaky faucet after he arrived, and contributed money for groceries. About 4 a.m., he went onto the beach, dove into shallow water, and was severely injured. Holding that he was a licensee, this court said that the economic benefit conferred by bringing firewood, repairing the faucet, and paying for groceries "was merely incidental to his status as a guest," and thus was insufficient to make him an invitee.[18]
Here, the trial court correctly ruled that Thompson was a licensee. Thompson and Berg did not bargain for Thompson to bring the car to Ariel, and Thompson did not do so as part of any "business dealings" between the two. Thompson was acting without promise of remuneration, except for Berg's promise to pay for gas which, like the $4 in Younce and the firewood in Swanson, was merely incidental to a purpose that was primary familial or social. Because Thompson did not enter the Katzers' land for any purpose directly or indirectly connected with "business dealings" between him and Berg, or between him and the Katzers, he was not a "business visitor," and thus not an invitee.
Although Thompson relies heavily on Ward v. Thompson,[19] that case does not alter our analysis.[20] In Ward, the defendant was building a house for his family. He asked his stepfather to come over and keep him company as he worked.[21] When the stepfather arrived, the defendant asked him to come up on a scaffold and help. The stepfather asked if the scaffold was strong enough to hold them both, and the defendant said it was. The stepfather then mounted the scaffold, which later collapsed with him on it. He sued for personal injuries and recovered a favorable jury verdict. On appeal, the Supreme Court affirmed, saying in part that the stepfather was an invitee.
Ward can be read in two ways: Either (a) the stepfather's purpose in going onto the stepson's land was connected with business dealings with the stepson, or (b) it was not. If the stepfather's purpose was connected with business dealings with the stepson, Ward is distinguishable from this case, for here there were no business dealings between Thompson and Berg, or between Thompson and the Katzers. If the stepfather's purpose was not connected with business dealings with the stepson, Ward has been modified, sub silentio, by later developments in the law. In 1966, five years after Ward was decided, the Supreme Court adopted Restatement (Second) of Torts § 332(3). As noted above, that section provides that a person is a "business visitor" only if he or she enters the land for a purpose connected with business dealings with the land's possessor. Today then, if the stepfather in Ward came onto the stepson's land for a purpose not connected with business dealings, the stepfather would not be an invitee.[22] We conclude that Ward does not make Thompson an invitee, regardless of how it is read.

II
Given that Thompson was a licensee, we turn to whether he produced evidence *426 sufficient to show a breach of the standard of care owed to licensees. Like the trial court, we conclude he did not.
When a person is a licensee, the occupier of land owes a duty of ordinary care to repair, warn of, or otherwise make reasonably safe, a dangerous condition on the landbut only if the occupier knows or should know of the condition; the occupier should realize that the condition involves an unreasonable risk of harm to the licensee; and the occupier should expect that the licensee will not discover the condition or, upon discovering it, will not perceive the risk arising from it.[23] In this case, every reasonable person would have expected Thompson to discover that there was snow and ice in the Katzers' drivewayas Thompson actually did, according to his own testimony. Moreover, every reasonable person would have expected such snow and ice to be slippery.[24] Thus, even when Thompson's evidence is viewed in the light most favorable to him, it fails to show a breach of the standard of care owed to licensees, and the trial court did not err by granting summary judgment.
Affirmed.
BRIDGEWATER, Acting C.J., and ARMSTRONG, J., concur.
NOTES
[1] Report of Proceedings (Feb. 13, 1995 a.m.) at 23.
[2] Report of Proceedings (Feb. 13, 1995 a.m.) at 84-85.
[3] Younce v. Ferguson, 106 Wash.2d 658, 666, 724 P.2d 991 (1986); see also Iwai v. State, 129 Wash.2d 84, 90, 915 P.2d 1089 (1996); Tincani v. Inland Empire Zoo. Soc'y, 124 Wash.2d 121, 128, 875 P.2d 621 (1994); Adkins v. Aluminum Co. of Am., 110 Wash.2d 128, 150, 750 P.2d 1257 (1988); Ford v. Red Lion Inns, 67 Wash.App. 766, 769, 840 P.2d 198 (1992); Swanson v. McKain, 59 Wash.App. 303, 307, 796 P.2d 1291 (1990).
[4] See Tincani, 124 Wash.2d at 128, 875 P.2d 621; Younce, 106 Wash.2d at 666-67, 724 P.2d 991; Swanson, 59 Wash.App. at 307, 796 P.2d 1291.
[5] Ford, 67 Wash.App. at 769, 840 P.2d 198; Swanson, 59 Wash.App. at 307, 796 P.2d 1291; but see Adkins, 110 Wash.2d at 150, 750 P.2d 1257 (jury categorizes plaintiff when evidence conflicts).
[6] McKinnon v. Washington Fed. Sav. & Loan Ass'n, 68 Wash.2d 644, 650, 414 P.2d 773 (1966) (adopting Restatement (Second) of Torts § 332(1) (1963)); Younce, 106 Wash.2d at 667, 724 P.2d 991; Steele v. Thorne, 72 Wash.2d 714, 716, 435 P.2d 544 (1967).
[7] McKinnon, 68 Wash.2d at 650, 414 P.2d 773 (adopting Restatement (Second) of Torts § 332(2)); Younce, 106 Wash.2d at 667, 724 P.2d 991; Steele, 72 Wash.2d at 716, 435 P.2d 544 6 Washington Practice, Washington Pattern Jury Instructions, Civil, (WPI) 120.05 (3d ed.1989).
[8] McKinnon, 68 Wash.2d at 650, 414 P.2d 773 (adopting Restatement (Second) of Torts § 332(3)); Younce, 106 Wash.2d at 667, 724 P.2d 991; Steele, 72 Wash.2d at 716, 435 P.2d 544; WPI 120.05.
[9] Dotson v. Haddock, 46 Wash.2d 52, 55, 278 P.2d 338 (1955); WPI 120.08; Restatement (Second) of Torts § 330.
[10] Steele, 72 Wash.2d at 717, 435 P.2d 544 (quoting Restatement (Second) of Torts § 330, comment (h)(3), at 175).
[11] Restatement (Second) § 330, comment (h)(3), at 175; see also Younce, 106 Wash.2d at 668-69, 724 P.2d 991.
[12] Enersen v. Anderson, 55 Wash.2d 486, 488, 348 P.2d 401 (1960); Dotson, 46 Wash.2d at 54, 278 P.2d 338; Deffland v. Spokane Portland Cement Co., 26 Wash.2d 891, 902, 176 P.2d 311 (1947); Kalinowski v. YWCA, 17 Wash.2d 380, 389, 135 P.2d 852 (1943); Garner v. Pacific Coast Coal Co., 3 Wash.2d 143, 148, 100 P.2d 32 (1940); Gasch v. Rounds, 93 Wash. 317, 321, 160 P. 962 (1916).
[13] Younce, 106 Wash.2d at 669, 724 P.2d 991 (benefit cannot be merely incidental); Swanson, 59 Wash.App. at 308-09, 796 P.2d 1291 (same); Ward v. Thompson, 57 Wash.2d 655, 658, 359 P.2d 143 (1961) (benefit must be material).
[14] Younce, 106 Wash.2d at 666, 724 P.2d 991. Based on Younce, we reject Thompson's argument that the common law's distinction between invitees and licensees should be discarded.
[15] 106 Wash.2d 658, 724 P.2d 991.
[16] See Younce, 106 Wash.2d at 669, 724 P.2d 991.
[17] 59 Wash.App. 303, 796 P.2d 1291.
[18] 59 Wash.App. at 309, 796 P.2d 1291.
[19] 57 Wash.2d 655, 359 P.2d 143 (1961).
[20] Thompson also relies on Haugen v. Central Lutheran Church, 58 Wash.2d 166, 361 P.2d 637 (1961), but that case is subject to the same analysis as Ward.
[21] 57 Wash.2d at 656, 359 P.2d 143.
[22] We also note in passing that the Ward court seems to have been questioning the very validity of the invitee-licensee distinction, which it labeled as "timeworn." Ward, 57 Wash.2d at 660, 359 P.2d 143; see also Younce, 106 Wash.2d at 662-63, 724 P.2d 991; Egede-Nissen v. Crystal Mountain, Inc., 93 Wash.2d 127, 131, 606 P.2d 1214 (1980); Haugen, 58 Wash.2d at 170, 361 P.2d 637; Mills v. Orcas Power & Light Co., 56 Wash.2d 807, 820, 355 P.2d 781 (1960) ("ancient categories"). In 1986, however, the Younce court expressly embraced that distinction.
[23] Memel v. Reimer, 85 Wash.2d 685, 689, 538 P.2d 517 (1975); Restatement (Second) of Torts § 342; WPI 120.01.
[24] We are unpersuaded by Thompson's contention that the snow and ice in the Katzers' driveway was more slippery than normal snow and ice. He testified:

Q: When you got out of the vehicle, you knew right away it was ice; is that correct?
A: You know, well I didn't know that I was walking on ice because you couldn't see it. Like I said, there was a really light [layer] of snow over the top of it, but it felt like it. Yeah; it felt like it.
Q: You knew it was really slick at that point; didn't you?
A: I didn't know it was that slick. I knew it was slick, but I didn't know it was that slick.
Q: You knew it was really slick; not just slick, but really slick; isn't that right?
A: If I knew it was completely really slick, I wouldn't have stepped
Q: Excuse me, Mr. Thompson. I don't want you to speculate. I am asking you what you knew. Did you knew when you stepped out of the car it was real slick?
A: I knew it was slick.
....
Q: Real slick?
A: Yeah, real slick.
Q: Really slick?
A: Yeah, that's what I said.
Report of Proceedings (Feb. 13, 1995 a.m.) at 84-85.