[No. 21696-5-II.   Division Two.   October 2, 1998.]

KURT HOME, ET AL., *Appellants*, v. NORTH KITSAP SCHOOL DISTRICT, *Respondent*.

*Thomas C. O'Hare* of *Smith, O'Hare & Mesenbrink*, for appellants.

*Eric P. Gillett* of *Preg, O'Donnell, Sargeant & Gillett, P.L.L.C.*, for respondent.

MORGAN, J. — Kurt Home sued the North Kitsap School

District for personal injuries sustained while coaching a junior high football game. North Kitsap moved for summary judgment, claiming that it was immune under RCW 4.24.210, the recreational land statute, and that Home had knowingly and voluntarily assumed the risk. The trial court granted the motion, and Home filed this appeal. We reverse.

In 1993, Home was a teacher in the Central Kitsap School District, an organization not related to the North Kitsap School District. He taught at Central Kitsap Junior High, where he was also a part-time assistant football coach. Ken Anderson was the head football coach.

On November 3, 1993, Home's Central Kitsap team played an away game on the football field at North Kitsap Junior High. Persons present included Home, Anderson, their team, and about 400 Central Kitsap parents, who had come as spectators. The football field is a permanent facility with football goal posts at each end and a track around the perimeter. It is available for public use when not being used for school events or activities. On November 3, it was being used exclusively for the North Kitsap-Central Kitsap football game, a school-sponsored event to which parents and other spectators were admitted without charge.

When Home and Anderson arrived at the North Kitsap field, they saw a curb "raised several inches above ground level,"[1] separating the football area from the track area. The curb ran along the outside of the football field's sideline area, not far from the sideline itself. Home and Anderson thought it was a hazard to any player who might be propelled out of bounds by momentum or by another player. After discussing several courses of action, they decided that Home would station himself in front of the curb, so he could stop any player who might be heading for it.

Later, during the game, Home was standing in front of

---

[1]Clerk's Papers at 58.

the curb when the Central Kitsap team ran a "sweep" play toward his side of the field. As he testified later:

I saw the kid coming to the sideline, I saw the tackler coming and saw imminent collision.

So I backed up to the cement and got my hands out and my body ready in case there was a collision, and sure enough their kid hit my kid . . . .

. . . .

. . . My kid was a full stride out of bounds and starting a second stride when he was impacted. He was going into the cement. And using both hands, I took him to the ground. And the North Kitsap player with most of his weight came across my left thigh.[2]

Home was injured, he alleges, as a result of this impact.

In July 1996, Home sued the North Kitsap School District for negligence. North Kitsap moved for summary judgment, contending (1) that it was immune under RCW 4.24.210, the recreational land use statute; (2) that Home was a licensee who could not prove a breach of the duty owed to licensees; and (3) that Home knowingly and voluntarily assumed the risk that culminated in the accident. The trial court granted the motion, and this appeal followed.

I.

■ North Kitsap argues that RCW 4.24.210 renders it immune from liability to Home. Relying on cases like *Bauer ex rel. Bauer v. Minidoka Sch. Dist. No. 331*[3] and *McIntosh v. Omaha Pub. Sch.*,[4] Home contends the statute does not apply.

The purpose of RCW 4.24.210(1) is "to encourage owners or others in lawful possession and control of land and water areas or channels to make them available to the public

---

[2]Clerk's Papers at 29-30.

[3]116 Idaho 586, 778 P.2d 336 (1989).

[4]249 Neb. 529, 544 N.W.2d 502 (1996).

for recreational purposes."[5] RCW 4.24.210(1) provides in pertinent part:

> [A]ny public or private landowners or others in lawful possession and control of any lands whether designated resource, rural, or urban, or water areas or channels and lands adjacent to such areas or channels, who allow members of the public to use them for the purposes of outdoor recreation, which term includes, but is not limited to, the cutting, gathering, and removing of firewood by private persons for their personal use without purchasing the firewood from the landowner, hunting, fishing, camping, picnicking, swimming, hiking, bicycling, skateboarding or other nonmotorized wheel-based activities, hanggliding, paragliding, the riding of horses or other animals, clam digging, pleasure driving of off-road vehicles, snowmobiles, and other vehicles, boating, nature study, winter or water sports, viewing or enjoying historical, archaeological, scenic, or scientific sites, without charging a fee of any kind therefor, shall not be liable for unintentional injuries to such users.

According to Division One, the proper approach when applying this statute is to analyze the purpose for which the landowner was using the land, as opposed to the purpose for which the plaintiff was using the land.[6] We agree, although we observe that a landowner may use the land for different purposes at different times. Here, then, it is necessary to focus on the nature of the landowner's use at the time of the accident being litigated.[7]

A number of other jurisdictions have dealt with the nature of a landowner's use when a school athletic field is sometimes used for school events and other times held open

---

[5]RCW 4.24.200.

[6]*Gaeta v. Seattle City Light*, 54 Wn. App. 603, 608-09, 774 P.2d 1255, *review denied*, 113 Wn.2d 1020 (1989).

[7]*Widman v. Johnson*, 81 Wn. App. 110, 114, 912 P.2d 1095, *review denied*, 130 Wn.2d 1018 (1996); *see generally Mathews v. Elk Pioneer Days*, 64 Wn. App. 433, 824 P.2d 541, *review denied*, 119 Wn.2d 1011 (1992).

for public use. In *Bauer*,[8] for example, the plaintiff suffered a broken leg when he tripped over sprinkler pipes while playing football on the grounds of the junior high school he attended. The injury occurred in the morning, a few minutes before classes commenced. The district showed that the football game took place before official school hours; that it was not organized or officiated by employees of the district; and that the school grounds were open for public use at other times. The Idaho Supreme Court said:

> Here, [plaintiff] was a public school student participating in a game being played at school as the school day was getting underway. [Plaintiff] was not merely a recreational user of the school premises, he was there as a student entitled to the protection of the district.[9]

The court further said:

> [Plaintiff] was not the type of recreational user contemplated in the recreational use statute. He was a public school student who came to school early before classes began to play football with his classmates. If he had come to the school grounds to play a game of football that was not organized or sanctioned by the school on a day when school was not in session, we would have no trouble in applying the statute to limit the liability of the district. Nor would we have any difficulty in applying the statute, if he had come to the school grounds on a school day to play a game of football that was not organized or sanctioned by the school before the faculty and other students who were not involved in the game began arriving. The problem we have in applying the recreational use statute to these facts is that [plaintiff] arrived to play football at the very time that the school was beginning its operations for the day, although no classes had begun. He was not just a member of "the public" referred to in the recreational use statute. He was there as a student to begin the school day with a game of football.[10]

Although the Idaho court phrased its statements in terms

---

[8]*Bauer*, 778 P.2d 336.

[9]*Id.* at 338.

[10]*Id.* at 339.

of the plaintiff's use of the field, it could just as easily have said that the school district, at the time of the injury, was using its facility solely for students, and not holding the facility open for use by members of the public. Thus, this case gives guidance here.

In *McIntosh v. Omaha Public School*,[11] for another example, a school-sponsored football game was played on a badly rutted field that apparently was open for public recreational use when the school was not using it. Declining to apply Nebraska's recreational use statute, the Nebraska Supreme Court said:

> Clearly, a student participating in a clinic sponsored by his school's athletic program does not fall under the category of recreational use of land open to members of the public without charge. Collin Field, as it pertained to McIntosh, was not open to members of the public without charge. Rather, at the time of McIntosh's injury, the field was open to students who were members or who intended to be members of the Omaha South High School football team.[12]

A number of other cases involve similar fact patterns, and most are at least consistent with *Bauer* and *McIntosh*.[13] A small number are contrary, but they are unpersuasive, in part because they involve governmental immunity

---

[11]544 N.W.2d 502.

[12]*McIntosh*, 544 N.W.2d at 508.

[13]*See Iverson v. Muroc Unified Sch. Dist.*, 32 Cal. App. 4th 218, 225-27, 38 Cal. Rptr. 2d 35 (1995); *Acosta v. Los Angeles Unified Sch. Dist.*, 31 Cal. App. 4th 471, 479, 37 Cal. Rptr. 2d 171 (1995); *Conway v. Town of Wilton*, 238 Conn. 653, 680 A.2d 242, 256 (1996); *Teters v. Scottsbluff Pub. Sch.*, 5 Neb. App. 867, 567 N.W.2d 314, 323-28 (1997). *Cf. University of Alaska v. Shanti*, 835 P.2d 1225 (Alaska 1992); *Yarber v. Oakland Unified Sch. Dist.*, 4 Cal. App. 4th 1516, 6 Cal. Rptr. 2d 437 (1992); *Ambrose v. Buhl Joint Sch. Dist. No. 412*, 126 Idaho 581, 887 P.2d 1088, 1090 (1994); *Powderly v. Colgate Univ.*, 248 A.D.2d 365, 669 N.Y.S.2d 640 (1998); *McGregor v. Middletown Sch. Dist. No. 1*, 593 N.Y.S.2d 609, 190 A.D.2d 923 (1993); *Rankey v. Arlington Bd. of Educ.*, 78 Ohio App. 3d 112, 603 N.E.2d 1151 (1992); *DiMino v. Borough of Pottstown*, 142 Pa. Commw. 683, 598 A.2d 357, 360-61 (1991), *appeal denied*, 533 Pa. 602 (1992); *Walsh v. City of Phila.*, 526 Pa. 227, 585 A.2d 445, 450-51 (1991).

rather than the kind of immunity afforded by RCW 4.24.210.[14] Turning to this case, a North Kitsap school administrator testified that the North Kitsap field, "including the area used for football games, is available for public use when school is not in session and *when it is not being used for a scheduled sport, such as a junior high school football game.*"[15] Thus, it is undisputed that North Kitsap was not holding the football field open for use by members of the public when Home was injured, and North Kitsap is not immune by virtue of RCW 4.24.210.

## II.

■■ We next consider whether Home was an invitee or licensee. As we explained in *Thompson v. Katzer,*[16] "An invitee is either a public invitee or a business visitor."[17] "A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public."[18] "A business visitor is a person who is invited to enter or remain on land for a

[14]*See Ozuk v. River Grove Bd. of Educ.*, 281 Ill. App. 3d 239, 666 N.E.2d 687, 217 Ill. Dec. 18 (1996); *Bubb v. Springfield Sch. Dist. 186*, 167 Ill. 2d 372, 657 N.E.2d 887, 212 Ill. Dec. 542 (1995); *Lewis v. Jasper County Community Unit Sch. Dist. No. 1*, 258 Ill. App. 3d 419, 629 N.E.2d 1227, 196 Ill. Dec. 383, *appeal denied*, 156 Ill. 2d 558 (1994); *Lanning v. Anderson*, 22 Kan. App. 2d 474, 921 P.2d 813 (1996); *Nichols v. Unified Sch. Dist. No. 400*, 246 Kan. 93, 785 P.2d 986 (1990).

[15]Clerk's Papers at 38 (emphasis added).

[16]86 Wn. App. 280, 936 P.2d 421, *review denied*, 133 Wn.2d 1020 (1997).

[17]*Id.* at 284 (quoting *McKinnon v. Washington Fed. Sav. & Loan Ass'n*, 68 Wn.2d 644, 650, 414 P.2d 773 (1966) (adopting Restatement (Second) of Torts § 332(1) (1963)); *see also Younce v. Ferguson*, 106 Wn.2d 658, 667, 724 P.2d 991 (1986); *Steele v. Thorne*, 72 Wn.2d 714, 716, 435 P.2d 544 (1967), *overruled on other grounds by Memel v. Reimer*, 85 Wn.2d 685, 538 P.2d 517 (1975)).

[18]*McKinnon*, 68 Wn.2d at 650 (adopting Restatement (Second) of Torts § 332(2)); *see also Younce*, 106 Wn.2d at 667; *Steele*, 72 Wn.2d at 716; 6 Washington Practice, Washington Pattern Jury Instructions: Civil 120.05 (3d ed. 1989) (WPI).

purpose directly or indirectly connected with business dealings with the possessor of the land."[19]

In contrast, a "licensee" enters the occupier's premises with the occupier's permission or tolerance, either (a) without an invitation or (b) with an invitation but for a purpose unrelated to any business dealings between the two.[20] The term "licensee" includes, at a minimum, (1) persons who come on the land solely for purposes of their own, (2) members of the occupier's household (except a boarder, servant or other person whose relationship with the occupier is primarily economic), and (3) social guests.[21]

Here, Home was an assistant football coach invited to North Kitsap's field so that a school-sponsored football game could be played. His presence was related to North Kitsap's business of running its schools, and he was an invitee as a matter of law.

## III.

■ North Kitsap claims that Home assumed the specific risk that culminated in the accident. Home disagrees, arguing primarily that he had no reasonable alternative course of action. Traditionally, the doctrine of assumption of risk has four facets: (1) express assumption of risk; (2) implied primary assumption of risk; (3) implied reasonable assumption of risk; and (4) implied unreasonable assumption of risk.[22] The third and fourth facets, implied reasonable and

---

[19]*McKinnon*, 68 Wn.2d at 650 (adopting RESTATEMENT (SECOND) OF TORTS § 332(3)); *see also Younce*, 106 Wn.2d at 667; *Steele*, 72 Wn.2d at 716; WPI 120.05.

[20]*Dotson v. Haddock*, 46 Wn.2d 52, 55, 278 P.2d 338 (1955); WPI 120.08; RESTATEMENT (SECOND) OF TORTS § 330.

[21]*Steele*, 72 Wn.2d at 717 (quoting RESTATEMENT (SECOND) OF TORTS § 330, cmt. (1-3), at 175).

[22]*Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 143, 875 P.2d 621 (1994); *Scott v. Pacific W. Mt. Resort*, 119 Wn.2d 484, 496, 834 P.2d 6 (1992); *Kirk v. Washington State Univ.*, 109 Wn.2d 448, 453, 746 P.2d 285 (1987); *Shorter v. Drury*, 103 Wn.2d 645, 655, 695 P.2d 116, *cert. denied*, 474 U.S. 827 (1985); *Alston v. Blythe*, 88 Wn. App. 26, 32, 943 P.2d 692 (1997); *Leyendecker v. Cousins*, 53 Wn. App. 769, 773, 770 P.2d 675, *review denied*, 781 P.2d 1320 (1989); W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 68 (5th ed. 1984).

implied unreasonable assumption of risk, are nothing but alternative names for contributory negligence,[23] and neither is pertinent here. The first and second facets, express assumption of risk and implied primary assumption of risk, raise the same question: Did the plaintiff consent, before the accident or injury, to the negation of a duty that the defendant would otherwise have owed to the plaintiff?[24] If the answer is yes, "the defendant does not have the duty, there can be no breach and hence no negligence."[25] Thus, when either facet applies, it bars *any* recovery based on the duty that was negated.[26]

Although the first and second facets involve the same idea—the plaintiff's consent to negate a duty the defendant would otherwise have owed to the plaintiff—they differ with respect to the way in which the plaintiff manifests consent.[27] With express assumption of risk, the plaintiff states in so many words that he or she consents to relieve the defendant of a duty the defendant would otherwise have. With implied primary assumption of risk, the plaintiff engages in other kinds of conduct, from which consent is then implied.[28] Here, we focus on implied

[23]*Scott*, 119 Wn.2d at 497; *see also Alston*, 88 Wn. App. at 32; *Leyendecker,* 53 Wn. App. at 774-75.

[24]*Scott*, 119 Wn.2d at 498; *Kirk*, 109 Wn.2d at 453-54; *Alston*, 88 Wn. App. at 33; *Dorr v. Big Creek Wood Prods., Inc.*, 84 Wn. App. 420, 426-27, 927 P.2d 1148 (1996).

[25]*Scott*, 119 Wn.2d at 497; *see also Tincani*, 124 Wn.2d at 143 (implied primary assumption of risk "is really a principle of no duty, or no negligence, and so denies the existence of the underlying action"); *Dorr,* 84 Wn. App. at 427 (implied primary assumption of risk "is only the counterpart of the defendant's lack of duty to protect the plaintiff from that risk") (quoting *Scott*, 119 Wn.2d at 498 n.30); *Alston*, 88 Wn. App. at 33; *Leyendecker,* 53 Wn. App. at 773.

[26]*Scott*, 119 Wn.2d at 496-98; *Alston*, 88 Wn. App. at 33; *Dorr,* 84 Wn. App. at 425; *Leyendecker,* 53 Wn. App. at 773.

[27]*Kirk*, 109 Wn.2d at 453; *Alston*, 88 Wn. App. at 33; *Leyendecker,* 53 Wn. App. at 773.

[28]*Scott*, 119 Wn.2d at 496-97; *Kirk*, 109 Wn.2d at 453 (citing W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS 496 (5th ed. 1984)); *Alston*, 88 Wn. App. at 33; *Dorr,* 84 Wn. App. at 427 ("Those who choose to participate in sports or other amusements likely to cause harm to the participant, for example,

consent, which we alternatively refer to as assumption of risk.

To invoke assumption of risk, a defendant must show that the plaintiff knowingly and voluntarily chose to encounter the risk.[29] Thus, "[t]he evidence must show the plaintiff (1) had full subjective understanding (2) of the presence and nature of the specific risk, and (3) voluntarily chose to encounter the risk."[30] Put another way, the plaintiff "must have knowledge of the risk, appreciate and understand its nature, and voluntarily choose to incur it."[31] Knowledge and voluntariness are questions of fact for the jury, except when reasonable minds could not differ.[32]

Whether a plaintiff decides *knowingly* to encounter a risk turns on whether he or she, at the time of decision, *actually and subjectively* knew all facts that a reasonable person in the defendant's shoes would know and disclose, or, concomitantly, all facts that a reasonable person in the plaintiff's shoes would want to know and consider.[33] Thus, "The test is a subjective one: Whether the plaintiff in fact understood the risk; not whether the reasonable person of ordinary prudence would comprehend the risk."[34] The plaintiff must "be aware of more than just the generalized risk of [his or her] activities; there must be proof [he or she] knew of and appreciated the specific hazard which

impliedly consent in advance to excuse the defendant from any duty to protect the participant from being injured by the risks inherent in such activity.").

[29]*See* RESTATEMENT (SECOND) OF TORTS § 496G (defendant has burden of proof on assumption of risk).

[30]*Kirk*, 109 Wn.2d at 453 (citing W. PAGE KEETON § 68, at 487); *Wagenblast v. Odessa Sch. Dist. No. 105-157-166J*, 110 Wn.2d 845, 858, 758 P.2d 968 (1988).

[31]*Shorter*, 103 Wn.2d at 656 (citing W. PAGE KEETON, TORTS § 68, at 486-87); *Martin v. Kidwiler*, 71 Wn.2d 47, 49, 426 P.2d 489 (1967); *Bailey v. Safeway Stores, Inc.*, 55 Wn.2d 728, 731, 349 P.2d 1077, 1078 (1960).

[32]*See Alston*, 88 Wn. App. at 34 (consent is question of fact for jury except when reasonable minds could not differ).

[33]Put another way, the question turns on whether the plaintiff actually and subjectively knew all facts that the defendant should have known and disclosed in the exercise of ordinary care, and all facts that the plaintiff should have known and considered in the exercise of ordinary care.

[34]*Shorter*, 103 Wn.2d at 656-57.

caused the injury."[35] And a plaintiff "appreciates the specific hazard" or risk only if he or she actually and subjectively knows all facts that a reasonable person in the defendant's shoes would know and disclose, or, concomitantly, all facts that a reasonable person in the plaintiff's shoes would want to know and consider when making the decision at issue.

Whether a plaintiff decides *voluntarily* to encounter a risk depends on whether he or she elects to encounter it despite knowing of a reasonable alternative course of action.[36] Thus, Division One has said that in order for assumption of risk to bar recovery, the plaintiff "must have had a reasonable opportunity to act differently or proceed on an alternate course that would have avoided the danger."[37] The Restatement comments:

> Since the basis of assumption of risk is the plaintiff's willingness to accept the risk, take his chances, and look out for himself, his choice in doing so must be a voluntary one. If the plaintiff's words or conduct make it clear that he refuses to accept the risk, he does not assume it. The plaintiff's mere protest against the risk and demand for its removal or for protection against it will not necessarily and conclusively prevent his subsequent acceptance of the risk, if he then

---

[35]*Shorter*, 103 Wn.2d at 657; *see also Klein v. R.D. Werner Co.*, 98 Wn.2d 316, 319, 654 P.2d 94 (1982) ("evidence must show that respondents knew of the specific defect causing their injuries before the assumption of risk doctrine applies"); *Martin*, 71 Wn.2d at 49-50 (there must be not only knowledge of a general danger, but also knowledge of the particular danger, and the knowledge and appreciation of danger by the plaintiff is to be directed toward the particular danger or risk which ends in the plaintiff's injury); RESTATEMENT (SECOND) OF TORTS § 496D cmt. b (plaintiff "must not only be aware of the facts which create the danger, but must also appreciate the danger itself and the nature, character, and extent which make it unreasonable").

Incidentally, this requirement of subjective knowledge is what separates assumption of risk and contributory negligence. Assumption of risk turns on what the plaintiff *did* know: *Did* he or she know all facts that a reasonable person in the defendant's shoes would have known? Contributory negligence turns on what the plaintiff *should* have known, or in alternative terms what a reasonable person in the plaintiff's shoes *would* have known, irrespective of what the plaintiff actually and subjectively knew.

[36]*Zook v. Baier*, 9 Wn. App. 708, 716, 514 P.2d 923 (1973); RESTATEMENT (SECOND) OF TORTS § 496E.

[37]*Zook v. Baier*, 9 Wn. App. at 716.

proceeds voluntarily into a situation which exposes him to it. Such conduct normally indicates that he does not stand on his objection, and has in fact consented, although reluctantly, to accept the danger and look for himself.[38]

Two cases illustrate. In *Dorr v. Big Creek Wood Products, Inc.*,[39] Knecht was logging at a remote site. His friend Dorr, also a logger, came to visit. Before approaching Knecht's position, Dorr looked for "widow-makers"—limbs from felled trees caught high in the branches of standing trees. Failing to see any, he walked toward Knecht. As he walked, he was hit and injured by a falling widow-maker that he had not seen. If he had seen it, realized the danger it posed, and decided to hurry under it, he would have actually and subjectively known all facts that a reasonable person would have known and disclosed (which is the same as to say he would have "appreciated the specific hazard which caused the injury"[40]), and he would also have known of a reasonable alternative course of action (e.g., remaining where he was, or walking around the area into which the widow-maker might fall). Thus, he would have knowingly and voluntarily assumed the risk. As it was, however, he failed to see the particular widow-maker, and he did not have the kind of subjective knowledge that is a prerequisite to assuming a risk. At most, he was contributorily negligent.

In *Alston v. Blythe*,[41] Alston wanted to walk from east to west across an arterial with two northbound and two southbound lanes. A truck driven by McVay stopped in the inside southbound lane, and McVay waved her across in front of him. A car in the outside southbound lane did not stop and struck her as she stepped out from in front of the truck. If Alston had seen the oncoming car, realized the danger, and decided to hurry across in front of it instead of waiting for it to pass, she would have known the facts that

---

[38]RESTATEMENT (SECOND) OF TORTS § 496E cmt. a.

[39]84 Wn. App. 420, 927 P.2d 1148 (1996).

[40]*Shorter,* 103 Wn.2d at 657.

[41]88 Wn. App. 26, 943 P.2d 692 (1997).

a reasonable person would have known and disclosed (which is to say she would have appreciated the specific risk), and she would have assumed the risk. As it was, however, she did not know the car was coming, and she did not have the subjective knowledge required by the doctrine of assumption of risk. At most, she was contributorily negligent.

In this case, Home does not seriously dispute that he knew all the facts that a reasonable person would have wanted to know and consider when deciding whether to position himself or herself as Home did. He does contend, however, that a rational trier of fact could find that once he actually and subjectively discovered the hazard that later culminated in the accident, he had no reasonable alternative but to stand in front of it and protect his students. Taking the evidence and inferences in the light most favorable to Home, we think that a rational trier could so find. Accordingly, we conclude that whether Home *voluntarily* assumed the risk is a question of fact for the jury, and that summary judgment should not have been granted.

Reversed and remanded for further proceedings.

HOUGHTON, C.J., and HUNT, J., concur.