IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MARGARET MONTGOMERY and<br>RICK MONTGOMERY, individually, | )<br>)<br>) | No. 38708-9-III |
| Appellants, | )<br>) | |
| v. | )<br>) | UNPUBLISHED OPINION |
| MARY BISHOP, and "JOHN DOE"<br>BISHOP, individually and as wife and<br>husband, and the marital community<br>composed thereof, | )<br>)<br>)<br>)<br>) | |
| Respondents. | )<br>) | |

LAWRENCE-BERREY, J. — Mary Bishop asked her grandson, Rick Montgomery, to take down a small shed on her property. Rick's mother, Margaret Montgomery, and a friend, later assisted. The Montgomerys were injured when the shed collapsed on them.

They brought suit against Ms. Bishop and alleged she breached her duty to them as licensees. Ms. Bishop successfully moved for summary judgment. The Montgomerys moved for reconsideration and asserted for the first time they were business invitees. The trial court denied their reconsideration motion.

The Montgomerys appeal only the denial of their reconsideration motion. We affirm because the Montgomerys, as a matter of law, were licensees, not invitees. But even if they were invitees, reconsideration was properly denied because the Montgomerys failed to present facts on which Ms. Bishop could be liable.

FACTS[1]

*Background*

Rick Montgomery went to visit his grandmother, Mary Bishop, to assist with moving items from her house into her garage. Mr. Montgomery's friend, Ethan Vargo, assisted him. Later, Ms. Bishop asked her grandson to take down a 12' by 8' shed on her property, and he agreed. Ms. Bishop said she wanted the shed taken down because it blocked her view.

Later, Margaret Montgomery, Mr. Montgomery's mother and Ms. Bishop's daughter, arrived and assisted them. When she learned that her mother wanted the shed to be taken down, she and her son discussed the best way to take it down and decided to remove the outer walls first.

---

[1] The facts come from the depositions of the Montgomerys and a friend and are undisputed.

2

Ms. Bishop did not pay for the work or provide instructions on how to take down the shed. She remained inside her house while the Montgomerys worked. After they removed the shed's outer walls, Ms. Bishop briefly came outside and asked them to save any copper wire so she could sell it. The Montgomerys were able to determine that there was only one short copper wire and decided that removing it was not worth their trouble. As they were making this determination, the shed shifted sideways and the roof collapsed, injuring them.

*Procedure*

The Montgomerys filed suit against Ms. Bishop claiming negligence. Their complaint identified themselves as licensees and "social guests" of Ms. Bishop at the time of their injuries. Clerk's Papers (CP) at 4. They alleged that Ms. Bishop breached her duty of care to provide and maintain a safe premises.

When deposed, Mr. Montgomery testified he had been on his grandmother's property many times before and he did not consider the shed to be unstable. Similarly, Ms. Montgomery testified the shed was "a nice shed, a stable shed." CP at 96. Mr. Vargo, the friend who assisted that day, testified in more detail.

He testified there was nothing about the shed that would cause anyone to believe it was unsafe. This changed after the outer walls were removed:

3

> [A]fter we took the walls off, I didn't really trust the . . . little beams because I just thought that they were a little bit too thin, in my opinion, but there was quite a few of them to hold it. But before that, there was really no issue with it.

CP at 148. He also testified about the shed's collapse:

> When [the Montgomerys] started to . . . get [the wires] out of that wood post, is when it started to slowly tip, and at the moment when it was tipping, . . . they were . . . inside . . . with it having no walls, . . . and that's when the roof collapsed on top of them.

CP at 144. When later questioned, he provided more detail:

> Q       . . . So were they actually yanking wiring or pulling wiring out, or were they just starting to manipulate the pole?
> . . . .
> A       I would probably say it was a little bit of a pull. Not really a forceful tug, but they were definitely kind of pulling on it . . . .

CP at 153-54.

Ms. Bishop then moved for summary judgment dismissal of the Montgomerys' premises liability claim. She argued she did not know of any dangerous condition associated with the shed and therefore could not have warned of any unreasonable risk of harm. In granting her motion, the trial court explained:

> [T]o create a genuine issue of material fact there must be evidence that Ms. Bishop had knowledge of a defect in the shed. There's no genuine issue of material fact that she had knowledge of it, a defect, or that there was in fact a defect. The testimony establishes that . . . there was no problem known until the deconstruction took place.

4

So it is undisputed, again, when I look at the facts in the light most favorable to the Montgomery's [sic] that this shed was stable and in good condition until [the Montgomerys] decided to take it down, and they decided the manner in which they would take it down.

So there was no dangerous condition that Ms. Bishop could have warned the Montgomery's [sic] about. They were in the position to perceive the condition when they began to take the shed down in the manner that they chose to take it down. . . .

Report of Proceedings at 21-22.

The Montgomerys moved for reconsideration on two grounds—newly discovered evidence (CR 59(a)(4)), and substantial justice (CR 59(a)(9)). In support of their motion, they filed two declarations, one from Ms. Montgomery and the other from her husband.[2] In their motion for reconsideration, the Montgomerys argued their counsel failed to discover a particular controlling case, *Ward v. Thompson*, 57 Wn.2d 655, 359 P.2d 143 (1961). Based on *Ward*, they argued Ms. Bishop owed them a higher duty, a duty to them as invitees, and she breached that duty. The trial court denied their motion.

The Montgomerys timely appealed.

ANALYSIS

The Montgomerys argue the trial court abused its discretion by not granting their motion for reconsideration. We disagree.

---

[2] The Montgomerys do not point to anything in the new declarations that is material. We therefore do not discuss the statements contained in them.

5

Whether to grant a motion for reconsideration is a matter within the sound discretion of the trial court; we will not reverse the court's ruling absent a showing of manifest abuse of discretion. *Hook v. Lincoln County Noxious Weed Control Bd.*, 166 Wn. App. 145, 158, 269 P.3d 1056 (2012); *Wilcox v. Lexington Eye Inst.*, 130 Wn. App. 234, 241, 122 P.3d 729 (2005). An abuse of discretion exists only if no reasonable person would have taken the view the trial court adopted, the trial court applied the wrong legal standard, or it relied on unsupported facts. *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 669, 230 P.3d 583 (2010).

Under CR 59, a trial court may grant reconsideration of a decision under nine enumerated grounds. Relevant here:

> (4) Newly discovered evidence, material for the party making the application, which the party could not with reasonable diligence have discovered and produced at the trial;
>  . . . .
> (9) That substantial justice has not been done.

CR 59(a). Rather than discuss whether these grounds support reversal of the trial court's order denying reconsideration, we resolve the matter by explaining why *Ward* is unhelpful to the Montgomerys. We begin by discussing the law of premises liability.

6

*Premises liability*

In premises liability actions, a person's status, based on the common law

classifications of persons entering on real property (invitee, licensee, or trespasser),

determines the scope of the duty of care owed by the possessor (owner or occupier) of

that property. *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 128, 875 P.2d

621 (1994). When the facts regarding a visitor's entry onto property are undisputed, the

visitor's legal status is a question of law. *Beebe v. Moses*, 113 Wn. App. 464, 467, 54

P.3d 188 (2002).

Washington has adopted the definitions of licensee and invitee from the

*Restatement (Second) of Torts* § 332 (AM. L. INST. 1965). *Id.* "A licensee is defined as 'a

person who is privileged to enter or remain on land only by virtue of the possessor's

consent.'" *Younce v. Ferguson*, 106 Wn.2d 658, 667, 724 P.2d 991 (1986) (quoting

RESTATEMENT § 330). "A licensee includes a social guest, that is, a person who has been

invited but does not meet the legal definition of invitee." *Id.*

By contrast,

> (1) An invitee is either a public invitee or a business visitor.
> (2) A public invitee is a person who is invited to enter or remain on
> land as a member of the public for a purpose for which the land is held open
> to the public.

7

> (3)  A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.

*McKinnon v. Wash. Fed. Sav. & Loan Ass'n*, 68 Wn.2d 644, 650, 414 P.2d 773 (1966)

(quoting and adopting RESTATEMENT § 332 (definition of invitee)).

### 1.    *The Montgomerys were not invitees*

When determining an entrant's status, the ultimate goal is to differentiate (1) an entry made for a business or economic purpose that benefits both entrant and occupier, from (2) an entry made for a purpose that either (a) benefits only the entrant or (b) is primarily familial or social.  *Thompson v. Katzer*, 86 Wn. App. 280, 286, 936 P.2d 421 (1997); *Beebe*, 113 Wn. App. at 467-68.

In *Katzer*,[3] Thompson sued his stepfather Berg and the Katzers for injuries that resulted from slipping on snow in the Katzers' driveway.  86 Wn. App. at 282-83.  Berg was house-sitting for the Katzers in Ariel, Washington, when he requested that Thompson drive his car to him from Vancouver, Washington.  *Id*. at 282.  Berg only offered Thompson to pay for the cost of gas for the trip.  *Id*. at 283.  At trial, Berg and the Katzers moved for dismissal, arguing that Thompson was a licensee and that they had not breached the duty of care owed to a licensee.  *Id*. at 284.  The trial court agreed and

---

[3] We refer to the case as *Katzer* so not to confuse it with *Ward v. Thompson*.

8

granted dismissal. *Id.* On appeal, Thompson argued that he was an invitee and that the act of driving Berg's car had economic value. *Id.* at 286. Thompson heavily relied on *Ward* to support his argument. *Id.* at 288.

The *Katzer* court rejected the argument that Thompson became an invitee simply because his activity bestowed an economic benefit on his stepfather Berg. In doing so, the court explained the role "economic benefit" plays when determining whether an entrant onto land is a licensee or invitee:

> [B]estowing of an economic benefit is an important factor to consider when deciding whether an entrant is an invitee or licensee, and that one who bestows such a benefit *may* be a business visitor. It does not follow, however, that the bestowing of an economic benefit is dispositive, or that one who bestows such a benefit is *always* a business visitor. The ultimate goal is to differentiate (1) an entry made for a business or economic purpose that benefits both entrant and occupier, from (2) an entry made for a purpose that either (a) benefits only the entrant or (b) is primarily familial or social. <u>Accordingly, an entrant will not be a "business visitor," even when he or she confers an economic benefit, if there is no "real or supposed mutuality of interest in the subject to which the visitor's business or purpose relates," or if the benefit is merely incidental to an entry that is primarily familial or social.</u> If the law were otherwise, every guest who brings a bottle of wine to the host of a residential dinner party would be a "business visitor," and the distinction between invitees and licensees . . . would be obliterated.

*Id.* at 286-87 (second emphasis added) (footnotes omitted).

The Montgomerys similarly rely on *Ward* to support their new argument that they were invitees. In *Ward*, the defendant stepson, Thompson, asked his stepfather, Ward, to

visit him at his new home's construction site. 57 Wn.2d at 656-57. Once Ward arrived, Thompson asked Ward to assist him with removing nails from lumber. *Id*. at 656. While Thompson stood on a scaffolding he built, about four feet off the ground, he asked Ward to mount the scaffolding to assist with holding a piece of siding. *Id*. at 656-57. Before mounting, Ward noticed that nails used to fasten one of the A-frame supports was partially pulled out. *Id*. Thompson reassured Ward that the scaffolding was safe. *Id*. at 657. Ward then climbed onto the scaffolding and it collapsed, causing injury. *Id*. On appeal, the court applied the economic benefit and invitation tests and held that Ward was a business invitee. *Id*. at 657-59.

The *Katzer* court noted that our Supreme Court adopted the definitions of invitee from *Restatement* § 332(3) five years after *Ward*. 86 Wn. App. at 288-89. And under § 332(3), an invitee is defined as a "business visitor," which is a person who is invited to enter or remain on the land for a purpose directly or indirectly connected with the landowner's business dealings. RESTATEMENT § 332(3). Accordingly, the *Katzer* court noted that *Ward* could be viewed in one of two ways: either Ward's visit to his stepson was connected with business dealings or it was not. 86 Wn. App. at 288. If it was connected to business dealings, then Thompson's case was distinguishable from *Ward* because there were no business dealings between Berg, himself, and the Katzers. *Id*.

If it was not connected to business dealings with his stepfather, then *Ward* had been modified by the adoption of § 332(3). *Id*. at 288-89. Regardless, the court found that Thompson was properly classified as a licensee and not an invitee. *Id*. at 289.

Applying the § 332(3) definition of invitee here, there were no business dealings between Ms. Bishop and the Montgomerys, either direct or indirect. The Montgomerys point to Ms. Bishop's request that they remove the copper wire to potentially sell as evidence of an economic purpose or material furtherance of her interests. But that fact alone does not support classifying them as business visitors because economic or business benefits must flow to both the landowner *and the entrant*. *See id*. at 286; *see also Afoa v. Port of Seattle*, 176 Wn.2d 460, 468-69, 296 P.3d 800 (2013). As in *Katzer*, without mutuality of interest in the removal of the shed, the trial court correctly classified the Montgomerys as licensees. Moreover, the unilateral benefit of a short strand of copper wire was incidental to the familial purpose of the visit, to help an older relative. We conclude as a matter of law, that the Montgomerys were licensees because they were primarily on Ms. Bishop's property as familial guests.

2. *The Montgomerys failed to present facts to support liability under their alternate theory of invitee*

Even were we to conclude that the Montgomerys could be invitees, they failed to present facts to support liability under that theory.

11

Possessors of land are subject to liability for physical harm caused to invitees by a condition on the land, if, but only if, (1) they know or by the exercise of reasonable care would discover and should realize that it involves an unreasonable risk of harm to such invitees, and (2) they should expect that the invitees will not discover or realize the danger or will fail to protect themselves against it, and (3) they fail to exercise reasonable care to protect them against the danger. *Morris v. Vaagen Bros. Lumber, Inc.*, 130 Wn. App. 243, 249-50, 125 P.3d 141 (2005) (quoting RESTATEMENT § 343).

The Montgomerys failed to present evidence of even the first element, i.e., that Ms. Bishop knew, or had reason to discover, the shed presented an unreasonable risk of harm to them. The Montgomerys and their friend agreed that the shed was sturdy. But once the outer walls were removed, it no longer was sturdy. This is to be expected. As one begins to take down a structure, it will become less stable until it collapses. That is the nature of the task. Here, it was not until one or both of the Montgomerys began pulling on the short copper wire that the structure collapsed.

The Montgomerys presented no evidence that Ms. Bishop had reason to believe that the small shed would easily collapse once the outer walls were removed. The instability did not exist until the outer walls were removed. The Montgomerys were in a better position to appreciate the instability of the shed than Ms. Bishop, who only briefly

came outside after the walls were removed. We conclude, even if the Montgomerys were invitees, that they failed to present evidence that Ms. Bishop breached her duty to them.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Siddoway, C.J.                    Fearing, J.

13