Taylor WYCOFF, Plaintiff–Appellee and Cross–Appellant,

and

American Medical Security Life Insurance Company, a Wisconsin insurance company, Intervenor–Appellee and Cross–Appellant,

v.

GRACE COMMUNITY CHURCH OF the ASSEMBLIES OF GOD, a Colorado nonprofit corporation, Defendant–Appellant and Cross–Appellee.

Nos. 09CA1151, 09CA1200, 09CA1222.

Colorado Court of Appeals, Div. VI.

Dec. 9, 2010.

Wilcox & Ogden, P.C., Ralph Ogden, Denver, Colorado, for Plaintiff–Appellee and Cross–Appellant.

David Lichtenstein, Denver, Colorado, for Intervenor–Appellee and Cross–Appellant.

Cooper & Clough, P.C., Paul D. Cooper, Jeremy L. Swift, Denver, Colorado, for Defendant–Appellant and Cross–Appellee.

Opinion by Judge CONNELLY.

Plaintiff, Taylor Wycoff, was seriously injured at a winter event held by defendant, Grace Community Church (Grace). Plaintiff and her insurer, intervenor American Medical Security Life Insurance Company (insurer), sued Grace and another defendant. Claims against that other defendant are addressed in *Wycoff v. Seventh Day Adventist Ass'n,* 251 P.3d 1258 (Colo.App.2010).

The jury returned verdicts against Grace totaling more than $4 million. The court reduced the total to $2 million (the limits of Grace's insurance), awarding some $1.775 million to plaintiff and $225,000 to insurer. After prejudgment interest and costs, the court entered judgment of $2.6 million for plaintiff and $324,000 for insurer. We generally affirm but vacate the judgment, and we order the trial court to enter judgment in the higher amounts unreduced by any insurance limits.

## I. Background

Plaintiff was seventeen years old at the time of the accident. Though not a church member, she was one of sixty youths to

attend a three-day, two-night event that Grace called "Winterama 2005."

Grace contracted with Seventh Day Adventist Association of Colorado (SDA) to hold the event at Glacier View Ranch, in Ward, Colorado. Grace paid SDA for rooms, meals, and use of the ranch.

Plaintiff's father paid Grace $40 for plaintiff to attend the event. Grace states that plaintiff did not pay more because it awarded her a "partial scholarship." Plaintiff and her mother signed Grace's one-page "Registration and information" form, which Grace contends released the personal injury claims now at issue.

After arriving and checking in at the ranch, plaintiff participated in church-sponsored activities. One activity was riding an inner tube tied to an all terrain vehicle (ATV) driven around a frozen lake. This activity had been conducted in past years by Grace, and also by SDA, without incident.

A large boulder was embedded in the lake some thirty-five feet from shore. A Grace chaperone, accompanied by another man, drove the ATV towing youth participants around the frozen lake. Plaintiff got on an inner tube, and the chaperone began towing her. On plaintiff's second loop around the lake, the Grace chaperone drove the ATV between the boulder and shoreline. Plaintiff's inner tube, still tied to the ATV, veered off and crashed into the boulder.

The crash broke plaintiff's back. She was rushed to intensive care and was hospitalized for several weeks. She suffered loss of bowel and bladder control, loss of vaginal sensation, and numbness in both legs making it difficult for her to walk and unable to run, bend, or squat.

## II. Enforceability of the Alleged Release

### A. Background

The purported release was in a one-page "Registration and information" form. It consisted of the third sentence (emphasis not in the original) in the following paragraph:

> I give permission for my child to participate in [Grace's] Winterama 2005 and all activities associated with it. I further give consent for any medical treatment neces-

sary to be given to my child in case of injury or sickness. *I will not hold Grace Community Church or it's [sic] participants responsible for any liability which may result from participation.* I also agree to come and pick up my child should they not obey camp rules.

The form was the subject of trial testimony after the court denied Grace's motion for summary judgment. Plaintiff testified that she knew the activities would include riding on an ATV-towed inner tube but that her mother did not know this. The trial court denied Grace's C.R.C.P. 50 motion for directed verdict at the close of plaintiff's case-in-chief, ruling that the jury could find either that plaintiff's mother had not made an informed release or alternatively that Grace had acted in a reckless manner not covered by any release.

Grace did not call plaintiff's mother to testify in the defense case. At the close of all the evidence, and outside the jury's presence, the parties discussed whether and how the jury should be instructed on the purported release. The trial court, for reasons not reflected in the record, ruled as a matter of law that the permission slip did not release Grace. It instructed the jury that the purported release was out of the case and should no longer be considered.

### B. Overview of Exculpatory Clauses Affecting Minors

The validity of exculpatory clauses purporting to release or waive future negligence claims is governed by four factors set out in *Jones v. Dressel,* 623 P.2d 370, 376 (Colo. 1981). Usually, the issue turns on the final factor: "whether the intention of the parties is expressed in clear and unambiguous language." *Id.*

In 2002, our supreme court held as a matter of public policy that parents cannot prospectively waive liability on behalf of minor children. *Cooper v. Aspen Skiing Co.,* 48 P.3d 1229 (Colo.2002). The next year, the General Assembly superseded *Cooper* by enacting a statute allowing parents to "release or waive the child's prospective claim for negligence." § 13–22–107(3), C.R.S.2010.

The statute superseding *Cooper* declared that parents have a fundamental right to make decisions on behalf of their children, including deciding whether the children should participate in risky activities. § 13–22–107(1)(a)(I)–(V), C.R.S.2010. It added that "[s]o long as the decision is voluntary and informed, the decision should be given the same dignity as decisions regarding schooling, medical treatment, and religious education." § 13–22–107(1)(a)(V). But it further provided that the statute does not permit a parent to waive a child's prospective claim for "willful and wanton, . . . reckless, . . . [or] grossly negligent" acts or omissions. § 13–22–107(4).

### C. Standard of Review

The relevant facts are undisputed, and our review is de novo. *See Wolf Ranch, LLC v. City of Colorado Springs,* 220 P.3d 559, 563 (Colo.2009) (de novo review of statutory issues); *Jones,* 623 P.2d at 376 (de novo review of validity of exculpatory clause prospectively releasing liability claims). Thus, while the record does not reflect the trial court's reasoning, we are able independently to review the form to determine whether it was a legally effective release.

### D. Analysis

■ The statute does not elucidate what is necessary to render a parent's decision to release a child's prospective claims "voluntary and informed," § 13–22–107(1)(a)(V). Grace contends this statutory language simply adopts the *Jones* standards for adults' prospective releases of their own claims. We disagree.

The statute uses language not found in *Jones* or its progeny. The supreme court in *Jones* noted that the release there did not "fall within the category of agreements affecting the public interest." 623 P.2d at 377. The inquiry relevant to this case—"whether the intention of the parties is expressed in clear and unambiguous language," *id.* at 376—does not expressly require that the decision to release one's own prospective claims be an "informed" one. We presume the legislature was aware of case law in this area, *see Specialty Restaurants Corp. v. Nelson,*

231 P.3d 393, 403–04 (Colo.2010), and that its use of a new term was intended to have some significance. Thus, the statutory requirement that the parental decision be an "informed" one must mean something more than that, as already required by *Jones,* the form's language be sufficiently clear to manifest intent to release liability.

We need not set forth in this case precisely how much information is required for a parental release to satisfy the statute. An "informed" decision—whether involving a legal or medical consent—typically means the "agreement to allow something to happen, [was] made with full knowledge of the risks involved and the alternatives." Bryan A. Garner, *Black's Law Dictionary* 346 (9th ed.2009) (defining "informed consent"); *cf. People v. Maestas,* 199 P.3d 713, 717 & n. 9 (Colo.2009) ("informed consent" for decisions waiving conflict-free counsel); *Garhart ex rel. Tinsman v. Columbia/Healthone, L.L.C.,* 95 P.3d 571, 587 (Colo.2004) ("informed consent" for medical decisions). In the present context, however, the legislature allowed parental releases "to encourage the affordability and availability of youth activities in this state." § 13–22–107(1)(a)(VI), C.R.S.2010. Arguably, this legislative aim could be undercut if courts required the same level of information to release a claim as to consent to a medical procedure.

There is *no* information in Grace's one-page registration form describing the event activities, much less their associated risks. Stating that the children would participate in "Winterama 2005 and all activities associated with it" does not indicate what the activities would involve and certainly does not suggest they would include ATV-towed inner-tube excursions around a frozen lake.

We are not persuaded by Grace's argument that it was denied an opportunity to offer evidence—in particular, testimony of plaintiff's mother—that the parental waiver was informed. We will assume for purposes of this case that a facially deficient exculpatory contract could be cured by extrinsic evidence. *But cf. Brooks v. Timberline Tours, Inc.,* 127 F.3d 1273, 1275 n. 2 (10th Cir.1997) (noting "some dispute in the Colorado case law about whether a plaintiff's experience or

lack of experience should be considered when determining the ambiguity of a release"). Even so, the trial court did not preclude Grace from offering any evidence bearing on the validity of the purported release. And it took this issue away from the jury only after the close of all the evidence. Grace thus could have called plaintiff's mother (whom it had listed as a potential trial witness), but it chose not to do so.

■ Finally, Grace's clause does not pass muster even under *Jones.* Such clauses "must be closely scrutinized," *Jones,* 623 P.2d at 376, because they are "disfavored." *Chadwick v. Colt Ross Outfitters, Inc.,* 100 P.3d 465, 467 (Colo.2004); *accord Boles v. Sun Ergoline, Inc.,* 223 P.3d 724, 726 (Colo.2010). A release need not contain any magic words to be valid; in particular, it need not specifically refer to waiver of "negligence" claims. *Heil Valley Ranch, Inc. v. Simkin,* 784 P.2d 781, 784–85 (Colo.1989). But, in every Colorado Supreme Court case upholding an exculpatory clause, the clause contained some reference to waiving personal injury claims based on the activity being engaged in. *See, e.g., Chadwick,* 100 P.3d at 468 (release detailed risks of hunting trip with animals and participant agreed to " 'RELEASE [outfitter] FROM ANY LEGAL LIABILITY ... for any injury or death caused by or resulting from' " participation in hunt); *Heil Valley Ranch,* 784 P.2d at 782 (release form stated that riding horse involved inherent risks, and participant "EXPRESSLY ASSUMES SUCH RISK AND WAIVES ANY CLAIM HE SHE MIGHT STATE AGAINST THE STABLES AS A RESULT OF PHYSICAL INJURY INCURRED IN SAID ACTIVITIES"); *Jones,* 623 P.2d at 372 (skydiving plaintiff released company "from any and all liability, claims, demands or actions or causes of action whatsoever arising out of any damage, loss or injury" resulting from "negligence ... or from some other cause").

Grace's form made no reference to the relevant activity or to waiving personal injury claims. The operative sentence (the third one in a paragraph) states only that plaintiff will not hold Grace "responsible for any liability which may result from participation."

Surrounding sentences address other issues: the first gives permission to attend; the second consents to medical treatment; and the fourth agrees to pick up disobedient children.

Grace contends its "waiver included liability for 'any' injuries related to 'all activities' conducted at Winterama 2005." But the form does not say this. And nowhere does the form provide parents with information allowing them to assess the degree of risk and the extent of possible injuries from any activity. The form is legally insufficient to release plaintiff's personal injury claims.

### III. Issues Under the Premises Liability Act

Grace contends the court made two errors under the Premises Liability Act, § 13–21–115, C.R.S.2010. First, Grace denies being a "landowner" covered by the Act. Second, it contends that plaintiff was a "licensee" rather than an "invitee." Because the facts relevant to these issues are undisputed, our review is de novo. *Lakeview Associates, Ltd. v. Maes,* 907 P.2d 580, 583–84 (Colo.1995).

■ The Act provides the sole remedy against landowners for injuries on their property. *Vigil v. Franklin,* 103 P.3d 322, 328–29 (Colo.2004). A landowner's duties turn on a trial court's determination of whether the plaintiff was an "invitee," a "licensee," or a "trespasser." § 13–21–115(3) & (4), C.R.S. 2010. The greatest duty is owed to an "invitee": a landowner must "exercise reasonable care" to protect such a person from dangers of which the landowner knew or should have known. *Lombard v. Colorado Outdoor Educ. Center, Inc.,* 187 P.3d 565, 575 (Colo. 2008) (construing § 13–21–115(3)(c)(I)). In contrast, a "licensee" is owed lesser, and a "trespasser" owed the least, duties. *See Vigil,* 103 P.3d at 328.

### A. Grace was a "Landowner"

■ The Act's definition of a "landowner" is broader than the term might suggest. *See* § 13–21–115(1), C.R.S.2010 (" 'landowner' includes, without limitation, an authorized agent or a person in possession of real property and a person legally responsible for the condition of real property or for the activities

conducted or circumstances existing on real property"). Thus, a "person need not hold title to the property to be considered a 'landowner.'" *Burbach v. Canwest Investments, LLC,* 224 P.3d 437, 441 (Colo.App.2009) (citing *Pierson v. Black Canyon Aggregates, Inc.,* 48 P.3d 1215, 1219 (Colo.2002)).

It is not apparent why Grace seeks to avoid landowner status under the Act. The Act, meant to *"protect* landowners," § 13–21–115(1.5)(e), C.R.S.2010 (emphasis added), eliminates common law negligence claims while imposing only a duty of reasonable care toward invitees and even lesser duties toward licensees and trespassers. *See Vigil,* 103 P.3d at 328–29. If Grace were correct that it was not covered by the Act, it still would have owed plaintiff a duty of reasonable care and could not argue that plaintiff was a mere licensee owed only lesser duties under the Act.

In any event, we have little difficulty concluding that Grace was a landowner as defined by the Act. A landowner includes one "legally responsible ... for the activities conducted ... on real property." § 13–21–115(1). This definition, which covers one "who is legally conducting an activity on the property," *Pierson,* 48 P.3d at 1221, plainly encompassed Grace. It was clear, from Grace's reservations agreement and understandings with SDA, that Grace was authorized to conduct (if not principally responsible for conducting) activities involving its group on the ranch property.

Grace's arguments against this straightforward conclusion are unpersuasive. Its argument that SDA owned the property fails, because the Act is not limited to property owners. *See Burbach,* 224 P.3d at 441.

Grace further argues that it was "only present on the property for a short time" and thus "in a much worse position than SDA to know of the conditions of the property, or to know whether a particular activity would be dangerous on the property." But the Act is not limited to those in exclusive possession of land, *see Pierson,* 48 P.3d at 1220, and the Act expressly contemplates that there may be multiple landowners in a case. *See* § 13–21–115(4). There accordingly is no need for a binary choice as to which entity, as be-tween Grace and SDA, was better able to protect plaintiff against injury. If Grace in fact had no reason to know of the relevant danger, that could provide a factual defense at trial rather than an exemption from the Act's coverage.

Grace finally suggests that treating it as a landowner would lead to absurd results because everyone engaged in activities on the ranch, including plaintiff herself, would also be a landowner. The instant appeal does not present any issue regarding who, other than Grace, might have been a landowner. We note, however, that the Act's definition of a landowner does not extend to everyone lawfully *participating* in activities on land; rather, it covers those "legally responsible ... for the activities conducted" on land. § 13–21–115(1). It is doubtful that a mere participant such as plaintiff was "legally responsible" for the activities conducted at the ranch. Regardless, we are convinced there is nothing unfair, much less absurd, in applying the Act to Grace—an entity that indisputably was responsible for the ATV activity conducted on the ranch.

### B. Plaintiff was an "Invitee" rather than "Licensee"

Grace's contention that plaintiff was not an "invitee" but was merely a "licensee" affects the duty owed by Grace to plaintiff. If plaintiff was an invitee, then the trial court correctly instructed the jury that Grace had to use reasonable care to protect against dangers of which it knew or reasonably should have known. *Lombard,* 187 P.3d at 570–71, 575. In contrast, had plaintiff been a mere licensee, Grace's duties would have been limited to actually known dangers. *See Vigil,* 103 P.3d at 328. We conclude that plaintiff was an invitee and, therefore, that the trial court correctly instructed the jury regarding Grace's obligations toward her.

An "invitee" is one who enters or remains on another's land "to transact business in which the parties are mutually interested or ... in response to the landowner's express or implied representation that the public is requested, expected, or intended to enter or remain." § 13–21–115(5)(a), C.R.S.2010. A

"licensee" is one who enters or remains on another's land "for the licensee's own convenience or to advance his own interests, pursuant to the landowner's permission or consent." § 13–21–115(5)(b). The statute expressly provides that the latter category "includes a social guest." *Id.*

The principal distinction between an "invitee" and a "licensee" turns on whether that person's presence on the land was affirmatively invited or merely permitted. The Second Restatement distinguishes an "invitation" from "mere permission" as follows: "an invitation is conduct which justifies others in believing that the possessor desires them to enter the land; permission is conduct justifying others in believing that the possessor is willing that they shall enter if they desire to do so." Restatement (Second) of Torts § 332 cmt. b (1965).

The Second Restatement gives examples of licensees whose presence is merely permitted rather than encouraged. "Examples of licensees" include those "taking short cuts across land with the consent of the possessor," "[l]oafers, loiterers, and those who enter only to get out of the weather, with permission to do so," and "[s]pectators and sightseers not in any way encouraged to come." Restatement (Second) of Torts § 330 reporter's notes (1965).

Here, Grace affirmatively encouraged, and did not simply permit, the presence of plaintiff and other youth attendees. Grace sponsored the event, secured access to the land and lodgings, and arranged for meals. It took affirmative steps—including driving plaintiff and the others to the ranch—to facilitate their attendance and participation. To further encourage plaintiff's attendance, Grace provided her with what it describes as a "partial scholarship."

Simply put, Grace invited plaintiff and the other youths to attend its organized event. Grace's actions demonstrate that Grace was affirmatively interested in having youths attend the event. Plaintiff's situation was not comparable to that of a licensee merely permitted but not invited to be on another's land.

Only one type of licensee is categorically deemed not to be an invitee despite having affirmatively been encouraged to enter another's land: a "social guest." *See* § 13–21–115(5)(b). As one treatise puts it, such a guest "is an invitee who is not an invitee." 5 *Harper, Gray, and James on Torts* § 27.11, at 234 (3d ed.2008).

We are not persuaded by Grace's contention that plaintiff was merely its social guest. Social hosts do not typically require their guests to sign permission slips and pay for their hospitality. Here, unlike a social guest accepting a host's unrequited hospitality, plaintiff attended an organized group event—for which her father paid Grace $40—intended to serve the mutual interests of the attendees and sponsor.

In contrast to the inapposite licensee categories, plaintiff falls more naturally within the Premises Liability Act's definition of an invitee. The Act creates two sometimes overlapping subcategories of invitees: (1) those present to transact business of mutual interest, and (2) public invitees. § 13–21–115(5)(a); *see also* Restatement (Second) of Torts § 332 & cmt. a (1965) (creating two similar subcategories, of "business visitors" and "public invitees," but explaining that many invitees could be placed in either class).

Grace contends that plaintiff was not an invitee because her invitation did not involve transacting business and was not extended to the general public. We disagree.

As to the former subcategory, commercial business was transacted between Grace and plaintiff: plaintiff's father paid Grace $40 so plaintiff could attend the event. That Grace ultimately may not have *profited* (because the $40 was included among monies paid over to SDA or because Grace defrayed remaining costs through award of a "partial scholarship") is not relevant under the Premises Liability Act.

Moreover, those present on land "to transact business in which the parties are mutually interested," § 13–21–115(5)(a), need not invariably be engaged in *commercial* activity. *See generally* Bryan A. Garner, *Black's Law Dictionary* 226 (9th ed.2009) (definition of "business" can include "transactions or mat-

ters of a noncommercial nature"); *cf. In re Parental Responsibilities of H.Z.G.,* 77 P.3d 848, 851–53 (Colo.App.2003) (holding that Colorado's long-arm statute, extending personal jurisdiction based on "[t]he transaction of any business within this state," § 13–21–124(1)(a), C.R.S.2010, applies to noncommercial activities; following out-of-state cases). Thus, other courts have extended "business invitee" status where nonprofit entities encouraged attendance by individuals whose presence provided no apparent economic benefit. *See, e.g., Thomas v. St. Mary's Roman Catholic Church,* 283 N.W.2d 254, 258 (S.D.1979) (visiting high school basketball player injured at a church school gymnasium was the church's "business invitee"); *Home v. N. Kitsap School Dist.,* 92 Wash.App. 709, 965 P.2d 1112, 1118 (1998) (visiting assistant football coach at game where no admission was charged was an invitee because "[h]is presence was related to [public school district's] business of running its schools").

As to the latter subcategory, one can be a "public" invitee where an invitation is extended to "the public, *or classes or members of it."* Restatement (Second) of Torts § 332 cmt. c (emphasis added). Thus, a garden club member was an invitee of an estate "opened to those members of the public who were on the Palm Beach Garden Club tour of homes." *Post v. Lunney,* 261 So.2d 146, 148 (Fla.1972). And a girl-scout leader was an invitee where a bank allowed the troop ("a segment of the public") free use of its facilities. *McKinnon v. Washington Fed. Sav. & Loan Ass'n,* 68 Wash.2d 644, 414 P.2d 773, 777–78 (1966).

Ultimately, plaintiff was an invitee because Grace's invitation carried an implicit assurance that Grace would act with reasonable care to protect her. *See* Dan B. Dobbs, *The Law of Torts* 600 (2000) ("The real point is that anyone who receives implicit or explicit assurance of safety is entitled to the invitee status and the reasonable care that goes with it."). Grace's post hoc denials of such implicit assurances are unpersuasive. Few youths would attend—and even fewer parents would allow and pay for their child's attendance at—an overnight event whose sponsor disclaimed any intent or ability to make the event reasonably safe.

## IV. Pretrial and Trial Proceedings

### A. Pretrial Election

■ Though the case went to the jury only on a Premises Liability Act (PLA) claim, Grace argues that plaintiff should have been required to elect before trial between PLA and negligence claims. But it would have been unfair to compel such an election before resolving Grace's contentions that it was not subject to the PLA. In any event, Grace was not prejudiced by lack of an earlier election. *Cf. Thornbury v. Allen,* 991 P.2d 335, 340 (Colo.App.1999) (harmless error to instruct jury on both negligence and PLA claims).

### B. Evidentiary Ruling

The trial court, over Grace's objection, allowed into evidence the rental agreement that prohibited Grace from using the ATVs to tow anything. Grace renews its CRE 401–403 contentions that this contract was irrelevant and unfairly prejudicial.

■ Trial courts have "broad discretion" to decide if documentary evidence should be admitted over relevancy and unfair prejudice objections. *Uptain v. Huntington Lab, Inc.,* 723 P.2d 1322, 1329 (Colo.1986). Here, it was within the trial court's broad discretion to conclude that the rental contract was relevant and had probative value that was not significantly outweighed by any danger of unfair prejudice. That Grace used the rented ATVs for a contractually prohibited activity—the very activity that injured plaintiff—could properly be considered by the jury in evaluating whether Grace used reasonable care under all the circumstances of this case.

### C. Closing Argument

Grace contends that plaintiff's counsel's closing argument was improper in various respects. None of Grace's current objections was timely raised in the trial court. Indeed, after the case had been submitted, Grace's counsel noted just one alleged error in plaintiff's closing argument; as to that single argument, he stated, "I don't know what a

remedy for that is, but I think the record should reflect that [this argument] did occur." The trial court responded that "[t]he record reflects what it was."

■ Our review of these unpreserved objections is exceptionally limited. There is no civil rule analogue to the criminal rule, Crim. P. 52(b), allowing plain error review. In civil damages cases, moreover, liberty is not at stake and there is no constitutional right to effective counsel. Thus, only in a "rare" civil case, involving "unusual or special" circumstances—and even then, only "when necessary to avert unequivocal and manifest injustice"—will an appellate court reverse based on an unpreserved claim of error. *Harris Group, Inc. v. Robinson,* 209 P.3d 1188, 1195 (Colo.App.2009) (discussing *Blueflame Gas, Inc. v. Van Hoose,* 679 P.2d 579, 586–87 (Colo.1984), and *Robinson v. City & County of Denver,* 30 P.3d 677, 684 (Colo.App.2000)).

Grace's unpreserved challenges to plaintiff's closing arguments do not come close to meeting this demanding standard. The closing arguments were not plainly improper and did not result in any manifest injustice.

## V. Amount of Judgment

■ The final issue is whether judgment should have entered in the full amount of the jury verdicts or a lesser amount covered by Grace's insurance. The trial court reduced the judgment to $2 million total but, because it construed Grace's policy to cover them, added prejudgment interest and costs. All sides challenge this amount. Grace contends the trial court acted erroneously (or at least precipitously) in construing the policy to cover prejudgment interest on top of the $2 million policy limits, while plaintiff and insurer contend that the amount of judgment should have been tied to the higher jury verdicts regardless of any lesser insurance coverage carried by Grace. We agree with plaintiff and insurer.

The issue turns on a construction of section 7–123–105, C.R.S.2010. That statute dates to 1967, a year after a fractured supreme court case (generating a majority opinion, a separate concurrence, two separate dissents, and an "addendum" by the author

of the majority opinion) grappled with the common law doctrine of charitable trust immunity. *See Hemenway v. Presbyterian Hospital Ass'n,* 161 Colo. 42, 419 P.2d 312 (1966). Surprisingly, the statute has never been construed in a published appellate opinion.

Before addressing the statute, we summarize the common law backdrop against which it was enacted. One thing was clear under Colorado common law: funds held in "trust" for charitable purposes could not be "depleted" by a tort judgment. *St. Mary's Academy v. Solomon,* 77 Colo. 463, 468, 238 P. 22, 24 (1925). Later cases also stated, however, that while this "trust-fund rule does not bar an action against a charitable institution based on the tort of its agents," "it does prohibit the levying of an execution under a judgment procured against it in such a suit on any property which is a part of the charitable trust." *O'Connor v. Boulder Colorado Sanitarium Ass'n,* 105 Colo. 259, 261, 96 P.2d 835, 835 (1939), *quoted and followed in St. Lukes Hospital Ass'n v. Long,* 125 Colo. 25, 28–29, 240 P.2d 917, 920 (1952).

Colorado cases thus distinguished between a permissible tort suit or judgment against a charity and the exemption of trust funds from levy or execution. In 1960, our supreme court wrote that "so-called charitable immunity does not protect from suit or judgment" and "immunity from attachment of trust funds does not come into play until such attachment is attempted." *Michard v. Myron Stratton Home,* 144 Colo. 251, 258, 355 P.2d 1078, 1082 (1960).

The distinction became blurred, and confusion was spawned, where it was undisputed a defendant charity had no non-trust-fund assets available to satisfy any judgment. That was the situation in *Hemenway,* where the justices divided over the propriety of pretrial dismissal. *Compare* 161 Colo. at 45, 419 P.2d at 313 (affirming dismissal because "no useful purpose would be served by directing this action to proceed to judgment" where parties stipulated there were no non-trust-fund assets available), *with id.* at 46, 419 P.2d at 314 (McWilliams, J., concurring) (agreeing dismissal should be affirmed, but only because parties had stipulated to it if trust-fund

doctrine remained viable), *and with id.* (Pringle, J., dissenting) (issue was "premature" because "in this State charitable immunity is not immunity from suit or liability for tort, but only a recognition that trust funds cannot be seized upon by execution nor appropriated to the satisfaction of tort liability").

That confusion should not have extended to the present case, where Grace indisputably had a $2 million insurance policy. Even under common law it was clear that insurance funds could be executed on to satisfy a tort judgment. *See O'Connor,* 105 Colo. at 261–62, 96 P.2d at 836.

In any event, the author of *Hemenway* invited Colorado's legislature to address the issue. *See* 161 Colo. at 49–53, 419 P.2d at 316–17 (addendum of Moore, J.). The General Assembly accepted this invitation a year later when it enacted the predecessor of the statute now codified as section 7–123–105. *See* Ch. 327, sec. 1, § 31–24–110, 1967 Colo. Sess. Laws 655.

The statute, titled "Actions against nonprofit corporations," does two things by its express terms. First, it removes any possible immunity from suit by providing that "[a]ny other provision of law to the contrary notwithstanding, any civil action permitted under the law of this state may be brought against any nonprofit corporation." § 7–123–105. Second, it allows for levy and execution against otherwise immune assets of nonprofit entities "to the extent" the entity would be reimbursed by liability insurance. *See id.* ("the assets of any nonprofit corporation that would, but for articles 121 to 137 of this title, be immune from levy and execution on any judgment shall nonetheless be subject to levy and execution to the extent that such nonprofit corporation would be reimbursed by proceeds of liability insurance policies carried by it were judgment levied and executed against its assets").

Thus, under the statute's plain terms, there is no longer (if there ever was) any impediment to suits against nonprofit organizations. The statute, moreover, does not limit the amount of any resulting judgment, but simply addresses "the extent" to which any such judgment is "subject to levy and execution." *Id.*

■ We conclude, under the plain language of the statute and under the prior common law, that the existence and amount of liability insurance provides no basis for limiting a judgment against a nonprofit or charitable defendant. Rather, the issue of liability insurance is relevant only when a plaintiff seeks to levy and execute on a judgment.

Here, therefore, it is premature to construe Grace's insurance policy to determine the extent of its coverage, including whether the policy would cover prejudgment interest in addition to any liability limit. Regardless of insurance coverage, plaintiff and insurer were entitled to entry of judgment against Grace to the full amount of a judgment that would have been entered against a for-profit entity. Whether and to what extent plaintiff and insurer ultimately can execute on their judgment is a separate issue that need not be decided at this juncture.

### VI. Conclusion

The judgment is vacated as to the amount, and the case is remanded for entry of a new judgment unreduced by any limits on Grace's insurance coverage. The judgment is affirmed in all other respects.

Judge CARPARELLI concurs.

Judge FURMAN dissents.

Judge FURMAN dissenting.

Plaintiff was seriously injured at a youth retreat (Winterama 2005) sponsored by Grace Community Church. She sued Grace for negligence. The jury returned verdicts against Grace totaling more than $4 million. I disagree with the majority as to

(1) the duties Grace owed plaintiff under the premises liability statute,

(2) the interpretation of the parental waiver statute, and

(3) various evidentiary errors.

Therefore, I respectfully dissent.

## I. Colorado's Premises Liability Statute

I agree with the majority that Grace was a landowner under Colorado's premises liability statute. Section 13–21–115(1), C.R.S.2010, of Colorado's premises liability statute provides: "For the purposes of this section, 'landowner' includes, without limitation, an authorized agent or a person in possession of real property and a person legally responsible for the condition of real property or for the activities conducted or circumstances existing on real property." *See Pierson v. Black Canyon Aggregates, Inc.,* 48 P.3d 1215, 1221 (Colo.2002) (construing the word "and" to distinguish between two broad classes of landowners).

As a landowner, Grace owed plaintiff duties depending on whether plaintiff was a "licensee" or an "invitee." Subsections (3)(b) and (c) of section 13–21–115 state, in relevant part:

(3)(b) A licensee may recover only for damages caused:

(I) By the landowner's unreasonable failure to exercise reasonable care with respect to dangers created by the landowner of which the landowner actually knew. . . .

(c)(I) . . . [A]n invitee may recover for damages caused by the landowner's unreasonable failure to exercise reasonable care to protect against dangers of which he actually knew or should have known.

The landowner's intent in offering the invitation determines the status of the visitor and establishes the duty of care the landowner owes the visitor. *See* § 13–21–115(5)(a), (b); *see also Carter v. Kinney,* 896 S.W.2d 926, 928 (Mo.1995). The status of the visitor and duty of care the landowner owes are questions of law for the court to decide. § 13–21–115(4) ("In any action to which this section applies, the judge shall determine whether the plaintiff is a trespasser, a licensee, or an invitee. . . .").

If a landowner invites a person to enter his land, and the landowner either expects a commercial benefit from that person or has extended an invitation to the public at large, the person is an invitee. Restatement (Second) of Torts § 332(2), (3) & cmts. c, d, e (1965); *see Carter,* 896 S.W.2d at 928; *see*

*also Wolfson v. Chelist,* 284 S.W.2d 447, 448 (Mo.1955)(invitee status arises "when the owner invites the use of his premises for purposes connected with *his own benefit, pleasure and convenience,*" and when this occurs, "the duty to take ordinary care to prevent [the invitee's] injury is at once raised and for the breach of that duty an action lies" (emphasis in original)(quoting *Glaser v. Rothschild,* 221 Mo. 180, 120 S.W. 1, 3, (1909))). Conversely, if a landowner either permits a person's entry onto his land or invites that person as his social guest, but the landowner does not expect a commercial benefit, that person is a licensee. Restatement (Second) of Torts § 330 cmts. a, h (1965). I conclude plaintiff was not an invitee because Grace neither expected a commercial benefit from plaintiff nor extended an invitation to the public at large.

### A. Invitee Status

Section 13–21–115(5)(a) defines "invitee" as a person who enters or remains on the land of another to transact business in which the parties are mutually interested or who enters or remains on such land in response to the landowner's express or implied representation that the public is requested, expected, or intended to enter or remain.

The two categories of invitees in section 13–21–115(5)(a) track those identified in the Second Restatement of Torts. *See* Restatement (Second) of Torts § 332(2), (3) (creating categories of "business visitor" and "public invitee"). I conclude plaintiff did not satisfy either category.

### 1. Business Visitor

Concerning the "business visitor" category, the majority concludes noncommercial activity can confer invitee status. However, the majority's conclusion conflicts with the opinion of another division of this court, which expressly recognized that "the General Assembly intended the 'invitee' status to apply in circumstances in which the 'landowner' receives a financial benefit from the relationship." *Maes v. Lakeview Assocs., Ltd.,* 892 P.2d 375, 377 (Colo.App.1994) (citing legislative history), *aff'd,* 907 P.2d 580 (Colo.1995);

*see also Wolfson,* 284 S.W.2d at 450 (invitation to invitee must confer some "material benefit motive"); Bryan A. Garner, *Black's Law Dictionary* 226 (9th ed.2009)(defining "business" as "[a] commercial enterprise carried on for profit," "commercial enterprises," or "[a] [c]ommercial transaction").

The majority quotes a portion of *Black's* definition of "business" for the proposition that " 'business' can include 'transactions or matters of a noncommercial nature.' " However, that definition has as its example, "the courts' criminal business occasionally overshadows its civil business." Hence, in that context, "business" means some type of purposeful activity not related to the other party, rather than business transactions "in which the parties are mutually interested." § 13–21–115(5)(a).

Thus, I believe the majority's holding that the "business" contemplated by section 13–21–115(5)(a) includes "transactions or matters of a noncommercial nature" (an activity that confers no commercial benefit) irreconcilably conflicts with the legislature's carefully chosen language. Moreover, in the two out-of-state cases relied on by the majority, there is little to no analysis of this issue. In *Thomas v. St. Mary's Roman Catholic Church,* the court baldly concludes the plaintiff was a "business invitee." 283 N.W.2d 254, 258 (S.D.1979). And in *Home v. North Kitsap School District,* the court merely recites its adoption of the Second Restatement to conclude that the plaintiff was an invitee without discussing the fact that the activity was noncommercial. 92 Wash.App. 709, 965 P.2d 1112, 1118 (1998); *see id.* at 1117 nn. 17–19.

Grace's then-youth pastor testified at trial, and it is not disputed, that when Grace received the monies from the youth for Winterama, he transferred those monies to SDA as a matter of course. Grace was thus a mere intermediary for the business transaction that occurred between plaintiff and SDA. Accordingly, because Grace derived no commercial benefit from the visit, I conclude plaintiff was not a business visitor. *See Maes,* 892 P.2d at 377; *see also Mooney v. Robinson,* 93 Idaho 676, 471 P.2d 63, 65 (1970) (holding that the "rendition by a social

guest of an incidental economic benefit to the occupier of the premises will not change the licensee's status to that of an invitee").

Moreover, no evidence was adduced at trial to support the trial court's finding that plaintiff rendered financial compensation—a commercial benefit—to Grace for its supervision of her. Rather, the undisputed evidence demonstrates that every dollar Grace received it remitted to SDA, and that the chaperones were not compensated. Thus, the trial court's conclusion that plaintiff was an invitee because "she entered on the property to transact business which was namely the promotion of spirituality, positive youth relationships for which she paid Grace to provide the supervision," which conferred no commercial benefit on Grace, was error. *See Maes,* 892 P.2d at 377; *see also Carter,* 896 S.W.2d at 928.

### 2. Public Invitee

Concerning the "public invitee" category, the majority concludes invitee status may lie where the invitation applies merely to "classes or members of" the public.

However, in discussing situations where a landowner extends an invitation to "classes or members of" the public, the Second Restatement includes the term "classes or members of" in the context of a variety of landowners inviting the *public at large* to enter:

> The nature of the use to which the possessor puts his land is often sufficient to express to the reasonable understanding of the public, *or classes or members of it,* a willingness or unwillingness to receive them. Thus the fact that a building is used as a shop gives the public reason to believe that the shopkeeper desires them to enter or is willing to permit their entrance, not only for the purpose of buying, but also for the purpose of looking at the goods displayed therein or even for the purpose of passing through the shop.

Restatement (Second) of Torts § 332 cmt. c (emphasis added).

Moreover, section 13–21–115(5)(a) defines "invitee" as "a person who enters or remains on the land of another . . . in response to the

landowner's express or implied representation that the public is requested, expected, or intended to enter or remain." The commonly accepted and understood meaning of "public" is "the people as a whole: populace, masses." *Webster's Third New International Dictionary* 1836 (2002). Hence, in a "public invitee" situation the landowner must invite the public at large or imply that the public at large is expected to enter or remain. This construction satisfies the legislative purpose "to clarify and to narrow private landowners' liability." *Pierson,* 48 P.3d at 1219.

Trial evidence reveals Grace did not extend its invitation to attend Winterama 2005 to the public at large, but limited its invitation to Grace's youth group and their friends. Grace's then-youth pastor testified that the Winterama waiver forms were mailed only to those youth who were on a list that the church had on file, that youth group students "would pick [the forms] up Wednesday night during a program," and that "[s]ome students took permission slips home to give to their friends." Likewise, when plaintiff was asked how she perceived Winterama 2005 before the event occurred, she confirmed that she understood Winterama to be "essentially a church retreat." Accordingly, I conclude plaintiff could not be a "public invitee" because there simply was no invitation to the public at large.

The majority's reliance on out-of-state cases, to conclude the invitation may apply only to select classes or members of the public, is misplaced. In *Post v. Lunney,* the plaintiff was declared to be a public invitee because she had been "invited to enter [land] which had been opened to those members of the public" who were on a tour of area homes. 261 So.2d 146, 148 (Fla.1972). There is no indication that the small subset of the public of which the plaintiff was a part was the only group or type of group that was allowed to tour the homes. The *Post* court expressly relied on subsection 2 of section 332 of the Restatement (Second) of Torts, which reads, "A public invitee is a person who is invited to enter or remain on land as a member of the public *for a purpose for which the land is held open to the public.*" *Id.*

(emphasis added). And in *McKinnon v. Washington Federal Savings & Loan Ass'n,* where the court determined the plaintiff also was a public invitee, the defendant held its premises open "for the free use of local clubs and organized groups for meetings and conferences, either during regular office hours or in the evenings," 68 Wash.2d 644, 414 P.2d 773, 774 (1966), and not solely for the plaintiff's select group. Thus, in both *Post* and *McKinnon,* the premises were otherwise held open to the public at large.

### B. Licensee (Social Guest) Status

A member of Grace's youth group asked plaintiff to attend Winterama 2005, and Grace provided its permission (after it received the parental consent form) before she could do so. Thus, I conclude plaintiff was a social guest (licensee) of Grace, and Grace owed plaintiff the duty to make safe dangers of which it was aware. § 13–21–115(3)(b), (5)(b); *see Carter,* 896 S.W.2d at 928.

Section 13–21–115(5)(b) defines "licensee" as "a person who enters or remains on the land of another for the licensee's own convenience or to advance [the licensee's] own interests." A social guest is one who has received a social invitation, and is a subclass of licensees. § 13–21–115(5)(b) (" 'Licensee' includes a social guest."); *see Carter,* 896 S.W.2d at 928.

The majority concludes plaintiff was not a social guest because "social hosts do not typically require their guests to sign permission slips and pay for their hospitality." Although the majority implies that social hosts *may* require their guests to sign permission slips, I believe the majority's conclusion overlooks the important difference between "invitation" and "permission." When courts decide if an individual is an invitee or a licensee, the distinction between invitation and permission is critical:

> Although invitation does not in itself establish the status of an invitee, it is essential to it. An invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter the land; permission is conduct justifying others in

believing that the possessor is willing that they shall enter if they desire to do so. . . .

Mere permission, as distinguished from invitation, is sufficient to make the visitor a licensee . . . ; but it does not make him an invitee, even where his purpose in entering concerns the business of the possessor.

Restatement (Second) of Torts § 332 cmt. b. Thus, if there is no invitation extended to the prospective plaintiff as would be extended to the general public, he or she is not an invitee, but rather a licensee who is on the land "pursuant to the landowner's permission or consent." § 13–21–115(5)(b).

Grace restricted its permission to attend Winterama 2005 to its own youth and their friends whose parents had waived in writing their right to hold Grace responsible for "any liability which may result from participation." Grace consented to the attendance of the youth on condition that the waiver was signed. The precondition of a waiver demonstrates that the Winterama participants were permitted to come rather than invited, which "is sufficient to make the visitor a licensee." Restatement (Second) of Torts § 332 cmt. b.

The Second Restatement's definition of "social guest" affirms that:

[A]lthough a social guest normally is invited, and even urged to come, he is not an "invitee," within the legal meaning of that term. . . . He does not come as a member of the public upon premises held open to the public for that purpose, and he does not enter for a purpose directly or indirectly connected with business dealings with the possessor. The use of the premises is extended to him merely as a personal favor to him.

Restatement (Second) of Torts § 330 cmt. h(3).

Plaintiff was not a member of Grace, and her attendance at Winterama 2005 was due solely to the influence of a male classmate of hers at the Denver School of the Arts, who expressly persuaded her to come to Winterama. She testified that her perception of Winterama 2005 was that "we would leave our everyday lives and go try to further our spiritual enlightenment." *See* Garner, *Black's Law Dictionary* 776 (social guest is

"[a] guest who is invited to enter or remain on another person's property primarily for private entertainment as opposed to entertainment open to the general public"); *Webster's Third New International Dictionary* at 1008 (a guest is "a person to whom hospitality . . . is extended").

Further, the majority surmises that Grace's invitation carried an "implicit or explicit assurance" that Grace would act with reasonable care to protect plaintiff. The majority reasons that "[f]ew youths would attend—and even fewer parents would allow and pay for their child's attendance at—an overnight event whose sponsor disclaimed any intent or ability to make the event reasonably safe." However, in its section on licensees, the Second Restatement explains that

there is a common understanding that the guest is expected to take the premises as the possessor himself uses them, and does not expect and is not entitled to expect that they will be prepared for his reception, or that precautions will be taken for his safety, in any manner in which the possessor does not prepare or take precautions for his own safety, or that of the members of his family.

Restatement (Second) of Torts § 330 cmt. h(3). Thus, as a social guest, plaintiff could rely on precautions that a landowner would take as he would for himself or for his family.

The evidence reveals the leaders regarded the youth attending Winterama 2005 as "social guests" because the leaders took precautions for the safety of the attendees as they would for their own safety. One chaperone testified he personally rode the inner tube towed by the ATV around the lake three or four times before plaintiff rode the inner tube. And the then-youth pastor testified that the leaders "walk[ed] pretty much the entirety of the lake, or [they] [would] get on the ATVs and drive it, too," to inspect the lake for "potential hazards" exhaustively before the ATV activity started. He said these hazards were the type that "could cause a safety issue with the activities that [they] were going to do on the ice" and that included sharp objects that could "cause the tube to puncture."

Another chaperone who drove the ATV—and who also participated in the inspection of the lake—testified that he had used an ATV and inner tubes to tow people "700 to 1000 times" and that he had in fact towed his own daughter behind the ATV on the lake such that "[he] treated [his daughter] just like any of the other students." Because the evidence shows Grace's chaperones not only took precautions that they would have for their own safety, but also took the same care for members of their own families as for other attendees, plaintiff was a licensee of Grace at Winterama 2005.

Because plaintiff was a licensee, Grace was entitled to additional protections under the premises liability statute. *See Pierson*, 48 P.3d at 1219 (overriding purpose of premises liability statute was "to clarify and to narrow private landowners' liability to persons entering their land, based upon whether the entrant is a ... licensee[ ] or invitee"). Accordingly, Grace was liable to plaintiff only "with respect to dangers created by the landowner of which the landowner actually knew." § 13–21–115(3)(b)(I). Because the jury was not so instructed, I would reverse the judgment and remand for a new trial.

## II. Colorado's Parental Waiver Statute

The majority interprets the word "informed" in section 13–22–107, C.R.S.2010, Colorado's parental waiver statute, to mean "made with full knowledge of the risks involved and the alternatives" (quoting Garner, *Black's Law Dictionary* at 346). The majority implies Grace's waiver form was facially deficient because it delineated neither the specific activities in which the youth would engage nor the risks associated with each activity. Because I conclude the majority's resolution of this issue vitiates the legislative intent expressed in the statute, I respectfully dissent.

The legislature explicitly stated the purpose of Colorado's parental waiver statute:

(I) Children of this state should have the maximum opportunity to participate in sporting, recreational, educational, and other activities where certain risks may exist;

(II) Public, private, and non-profit entities providing these essential activities to children in Colorado need a measure of protection against lawsuits, and without the measure of protection these entities may be unwilling or unable to provide the activities;

(III) Parents have a fundamental right and responsibility to make decisions concerning the care, custody, and control of their children. The law has long presumed that parents act in the best interest of their children.

(IV) Parents make conscious choices every day on behalf of their children concerning the risks and benefits of participation in activities that may involve risk;

(V) These are proper parental choices on behalf of children that should not be ignored. So long as the decision is voluntary and informed, the decision should be given the same dignity as decisions regarding schooling, medical treatment, and religious education; and

(VI) It is the intent of the general assembly to encourage the affordability and availability of youth activities in this state by permitting a parent of a child to release a prospective negligence claim of the child....

§ 13–22–107(1)(a)(I)–(VI). Hence, the legislature intended (1) to afford children the "maximum opportunity" to engage in "essential activities" having "certain risks"; (2) to uphold and effectuate the choices of parents for their children "concerning the risks and benefits of participation in" potentially risky activities; and (3) to give "public, private, and non-profit entities ... a measure of protection" by insulating them from liability for negligent conduct during "activities that may involve risk." *Id.* Based on these purposes, the legislature stated, "A parent of a child may, on behalf of the child, release or waive the child's prospective claim for negligence." § 13–22–107(3). Accordingly, the word "informed" ought to be construed in light of the statutory scheme, which is geared toward expanding children's access to activities involving risk yet simultaneously contracting the liability exposure of entities providing those activities, so that those entities might

have a "measure of protection" and not be "unwilling or unable to provide the activities." § 13–22–107(1)(a)(I), (II), (VI).

### A. Informed Consent

Section 13–22–107 does not define the term "informed." I agree with the majority that "informed" as defined in *Black's Law Dictionary* at 346—"made with full knowledge of the risks involved and the alternatives"—should govern this analysis. Accordingly, I conclude the term "informed" in section 13–22–107 means only that a parent be "informed" as to the possible risks involved.

Applying this definition, I conclude the waiver in this case was sufficient, for several reasons. First, the waiver identified the general nature of the activities to which the waiver applied: "Winterama 2005 and all activities associated with it." Second, the waiver identified the possible risks associated with Winterama 2005—"injury or sickness"—and even required the parent to consent to any medical treatment Grace might need to administer or pay for in the event of such injury or sickness. Third, even though the waiver did not state verbatim, "I recognize I have the right to sue Grace in the event the negligence of Grace or its agents causes my child personal injury, but I give up that right voluntarily," the waiver nevertheless more than accomplished this purpose—by stating the signing parent "will not hold [Grace] or it's [sic] participants responsible for any liability which may result from participation." Thus, I conclude the waiver was sufficient to give Grace the "measure of protection" from legal liability that section 13–22–107 envisions.

In canvassing the case law where the supreme court upheld the validity of waivers, the majority concludes that a waiver must "contain[ ] some reference to waiving personal injury claims based on the activity being engaged in." I disagree with this conclusion because I believe the majority reads the statute more broadly than the legislature intended. The majority would require public, private, or nonprofit organizations to include in their waiver forms a plethora of activities and, with respect to each, "assess the degree of risk and the extent of possible injuries from any activity." I believe the logical result would be absurd disclosure requirements, such as,

> Children attending Winterama 2005 will be staying in cabins. The paths and steps leading to each cabin may be snow-packed and icy. There is a risk that your child may slip and fall on the paths or steps and a fall may result in serious injuries including, without limitation, broken bones, concussions, and paralysis,

or lengthy booklets describing every conceivable activity and associated possible injury. I disagree with this approach because, in my opinion, it would unduly expose those entities to liability for activities that the entities inadvertently failed to identify and include in their parental waiver forms, or for activities that they could not possibly know or anticipate. Further, such an approach runs contrary to the legislative intent of providing "a measure of protection against lawsuits," and without that measure of protection, these entities may be unwilling or unable to provide these "essential activities" to children in Colorado. I believe it is not reasonable to expect organizations operating under section 13–22–107 to anticipate every permutation of a recreational event.

Moreover, I would not engage in what I respectfully believe to be the majority's parsing of the waiver. The waiver at issue is addressed to the everyday, commonsense parent. I submit the everyday, commonsense parent would not analyze what each sentence of a waiver specifically addresses apart from each other sentence, but rather would comprehend what the waiver addresses *en toto*: a release of his or her child's prospective claim for negligence. *See* § 13–22–107(3).

### B. The Parental Waiver Affirmative Defense

In addition, I conclude the trial court committed reversible error when, on the morning of closing arguments, it sua sponte precluded the jury from considering the affirmative defense of parental waiver. *See Pollock v. Highlands Ranch Community Ass'n*, 140 P.3d 351, 354 (Colo.App.2006).

The day before closing arguments occurred, the trial court originally determined that a jury instruction concerning the effect of the waiver could not be given because the supreme court assigned the determination of the effect of the waiver to the trial court as a question of law. *Cf. Heil Valley Ranch, Inc. v. Simkin,* 784 P.2d 781, 784 (Colo.1989). But after counsel for Grace pointed out the court's resolution of this issue essentially would be "to take that from the jury" and that the court "need[ed] to state the basis" for its ruling, the court said it would "hold off on the jury instruction piece."

When the issue arose again late that same day, after the close of evidence and during the jury instructions conference, plaintiff's counsel argued the language in the waiver did not suffice to make plaintiff's mother "informed." The court asked plaintiff's counsel to state his position on the affirmative defense of waiver, and he said,

> What I think—what I would like to see the Court do, Your Honor, is to declare the effect of this release, and I think the effect of this permission slip doesn't say this, does not have the effect of releasing the defendant's [sic] from the premises liability claims.

The court responded, "I want to take a few minutes to think about this.... We'll be in recess." After that exchange and a brief statement from counsel for SDA, the record abruptly ceases. There is nothing about the court's thoughts on the waiver until early the next day during its instructions to the jury right before closing arguments. At this time, the court announced to the jury that "the Court has ruled as a matter of law that Exhibit 85 [the parental waiver] is not a defense to Plaintiff's claims in this case" and struck the waiver from the record with no further elaboration.

In my view, the trial court erred in taking the issue away from the jury. I acknowledge that "[t]he determination of the sufficiency and validity of an exculpatory agreement is [primarily] a question of law for the court to determine." *Jones v. Dressel,* 623 P.2d 370, 376 (Colo.1981). However, contrary to the majority, I conclude Grace presented sufficient evidence for the trial court to submit to the jury the parental waiver as an affirmative defense.

"An affirmative defense 'is a legal argument that a defendant, who is capable of being sued, may assert to require the dismissal of a claim or to prevail at trial.'" *Paratransit Risk Retention Group Ins. Co. v. Kamins,* 160 P.3d 307, 319 (Colo.App.2007) (quoting *State v. Nieto,* 993 P.2d 493, 507 (Colo.2000)). The parental waiver defense, if successful, would allow Grace to avoid premises liability. Accordingly, it is an affirmative defense.

Because waiver is an affirmative defense, the defendant has the burden to prove waiver. C.R.C.P. 8(c); *see City of Westminster v. Centric-Jones Constructors,* 100 P.3d 472, 480 (Colo.App.2003) ("Failure to mitigate damages is an affirmative defense under C.R.C.P. 8(c) on which the defendant bears the burden of proof."); *see also Fidelity & Deposit Co. v. Colo. Ice & Storage Co.,* 45 Colo. 443, 449, 103 P. 383, 386 (1909) (defendant had burden of proof to sustain proffered affirmative defense); *Tracz v. Charter Centennial Peaks Behavioral Health Sys., Inc.,* 9 P.3d 1168, 1174 (Colo.App.2000) (concluding defendants "met their initial burden of production to establish their affirmative defense"). And section 13–22–107 is an affirmative defense to premises liability because section 13–21–115 "does not exclusively limit defenses and does not abrogate statutorily created defenses, which were available to landowners before the 2006 amendment and afterward." *Tucker v. Volunteers of Am. Colo. Branch,* 211 P.3d 708, 711 (Colo.App. 2008), *aff'd sub nom. Volunteers of Am. v. Gardenswartz,* 242 P.3d 1080 (Colo.2010).

At trial, under C.R.C.P. 8(c), the trial court's only responsibility was to assess whether Grace presented sufficient evidence to support the affirmative defense of parental waiver. *See Fair v. Red Lion Inn,* 943 P.2d 431, 437 (Colo.1997)(holding that failure to mitigate damages, an affirmative defense under C.R.C.P. 8(c), "will not be presented to the jury unless the trial court determines there is sufficient evidence to support it"); *cf. Stauffer v. Karabin,* 30 Colo.App. 357, 363–64, 492 P.2d 862, 865 (1971)(where doctor in malpractice suit presented evidence that his

failure to inform plaintiff of all risks attendant to an operation was consistent with community medical standards, "the determination then becomes one for the jury and a directed verdict in favor of plaintiff would not be warranted").

I believe the trial court misapprehended its duty with regard to the legal sufficiency of Grace's parental waiver. The question whether a parental waiver is "voluntary" is answered if the parent is shown to have signed the waiver. The question whether a parental waiver is "informed" is answered if the waiver on its face defines the possible risks and the general nature of the activities to which the waiver applied. *See* Garner, *Black's Law Dictionary* at 346 ("informed" is "made with full knowledge of the risks involved and the alternatives"). To this end, the parental waiver statute focuses on the risks involved in recreational activities for children as it affirms the conscious choices that parents make for their children. § 13–22–107(1)(a)(I), (IV). Thus, if the parental waiver is both "voluntary" and "informed," the trial court must submit the affirmative defense of parental waiver to the jury.

I would conclude Grace presented sufficient evidence to support its affirmative defense of parental waiver. The parental waiver was signed voluntarily because, as plaintiff herself testified, her mother signed the waiver two days before Winterama 2005 occurred. And the parental waiver on its face not only informed mother of the possible risks associated with Winterama 2005—"injury or sickness"—but also revealed her willingness to "not hold [Grace] or it's [sic] participants responsible for any liability which may result from participation." Thus, I conclude the trial court should have permitted the jury to consider Grace's affirmative defense of parental waiver, and believe it erred in not doing so.

Moreover, the way the trial court ruled on the evidence of waiver throughout the case—until it removed Exhibit 85 from the trial evidence and jury's consideration—reveals that Grace had no reason to expect it had to clear up any lingering questions of fact for the jury to consider the affirmative defense of parental waiver. For example, before trial, Grace moved for summary judgment on the issue of waiver, but the court ruled there was a question of fact "as to whether a permission slip was signed on behalf of Plaintiff." (The original apparently was lost by the hospital.) In response, during plaintiff's case-in-chief, counsel for Grace established that plaintiff's mother in fact had signed the waiver, and that Grace received the waiver before the Winterama event.

Based on this uncontroverted testimony, at the close of plaintiff's case Grace moved for a directed verdict. But the court found "the jury could conclude that there was inadequate notice to the mother" and "a jury could conclude that the activity [in question] was a reckless act or grossly negligent act for which a parent is not permitted to waive the child's prospective claim for such conduct." The court concluded this despite the fact that plaintiff in her complaint did not assert any claim for tortious conduct rising above the level of simple negligence. Again, in response, Grace used both expert testimony and lay testimony in its case to establish that the ATV activity was done in a safe manner. Nevertheless, as noted, on the morning of closing arguments the court told the jury that it could not consider the parental waiver. At that point, its role should have been limited to deciding whether Grace had presented sufficient evidence to support the existence of the parental waiver as an affirmative defense. The court did not so limit its role.

Accordingly, I would reverse the judgment and remand for a new trial.

### III. The ATV Rental Contract

The majority concludes the trial court did not abuse its discretion in allowing the ATV rental contract into evidence over Grace's objection. I respectfully disagree. There was nothing in the contract, and no evidence regarding the parties' intent was adduced, to suggest plaintiff's injury was a danger that Blue Sky Motors—who was not a party to this case—and Grace, the two parties to the ATV contract, knew about or should have known about in this premises liability case.

For all these reasons, I would reverse the judgment and remand for a new trial.