23CA1680 Castle v Jim's Auction 10-23-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1680
Montrose County District Court No. 22CV30037
Honorable Mary E. Deganhart, Judge

Jared Castle, Laura Castle, and Tanner Castle,

Plaintiffs-Appellants,

v.

Jim's Auction Service, Inc.,

Defendant-Appellee.

JUDGMENT AND ORDER REVERSED,
AND CASE REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE WELLING
Brown and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 23, 2025

Western Slope Law, Nelson A. Waneka, Glenwood Springs, Colorado; Doehling
Law, P.C., Keller A. Caubarreaux, Joseph H. Azbell, Grand Junction, Colorado,
for Plaintiffs-Appellants

Wegener Lane & Evans, P.C., Dalen B. Porter, Grand Junction, Colorado, for
Defendant-Appellee

¶ 1   In this Premises Liability Act (PLA) case, plaintiffs, Tanner Castle, Jared Castle, and Laura Castle[1] (collectively, the Castles), appeal (1) the trial court's pretrial determination that Tanner was a "licensee" as a matter of law at the time of his injury; and (2) the court's dismissal, after a bench trial, of the Castles' premises liability action against the defendant, Jim's Auction Service, Inc. (Jim's Auction).  We reverse the judgment and remand the case with directions.

## I.   Background

### A.   Factual Background

¶ 2   From February 6 to 8, 2021, Jim's Auction held its annual machinery consignment auction (the 2021 auction).  The 2021 auction was open to the public.  Fourteen-year-old Tanner accompanied his parents, Jared and Laura, to the 2021 auction on February 6 and 8.  All three members of the Castle family helped out at the 2021 auction in some capacity, and Tanner and his father also attended the auction to purchase a vehicle for Tanner to

---

[1] Given that all the individual members of the Castle family share a last name, we will refer to them by their first names (e.g., Jared, Laura, or Tanner).  We mean no disrespect by doing so.

drive once he turned fifteen and obtained his driving permit. During the 2021 auction, Tanner was seriously injured while operating a rope gate and before he could bid on a vehicle.

¶ 3    Nolan Kearns owns Jim's Auction.  For thirty-five years, Jim's Auction had utilized a rope gate to secure an exit on the auction grounds that led to a nearby county road.  The person working the rope gate had to lower the rope to the ground to allow vehicles to pass over the rope to exit the auction and enter the adjacent county road.  Once a vehicle had passed over the rope, the person working the rope gate would raise the rope and attach the loose end of the rope to a fence to prevent vehicles from passing through the rope gate until authorized to do so.  Until the date of Tanner's injury, those who operated the rope gate did so without issue.  Every attendee at the 2021 auction who purchased a vehicle or piece of equipment had to exit the auction grounds through the rope gate.

¶ 4    For the 2021 auction, Kearns modified the rope gate, changing how the rope attached to the fence when in the "closed" position. Kearns added an additional piece of nylon to the end of the rope and created a slipknot at the end of the nylon.  To open and close

the new rope gate, the operator had to place the slipknot over a piece of rebar attached to the fence.

¶ 5     During the previous year's auction (the 2020 auction), Tanner had performed miscellaneous tasks over the course of the three-day auction, including working the rope gate without issue.  After the conclusion of the 2020 auction, Jim's Auction paid Tanner for his work.

¶ 6     For the 2021 auction, Jim's Auction employed Tanner's mother, Laura, as an auction clerk, and Kearns asked Tanner's father, Jared, to help the day of the auction by starting the vehicles to be auctioned off.  Jim's Auction paid Laura for her work and Jared for his help.  Tanner helped his father start vehicles for the auction on both February 6 and 8, in addition to engaging in other "job duties" around the auction grounds.  While Tanner wasn't an employee of Jim's Auction during the 2021 auction season, Tanner expected Jim's Auction to pay him for helping, just as it had paid him for his help during the 2020 auction.

¶ 7     Jim's Auction employed Tanner's seventeen-year-old cousin, Tyler Reed, to work the 2021 auction.  Reed's primary duty was to operate the rope gate.  Before the 2021 auction, Kearns showed

3

Reed how to operate the new rope gate. Specifically, Kearns instructed Reed to not hold onto the rope when a vehicle was present and passing over the rope gate. On the Saturday before the 2021 auction began, Reed showed Tanner how to work the new rope gate, and Tanner briefly worked the new rope gate that day without issue.

¶ 8    On February 8, 2021, after Tanner had finished helping Jared start vehicles for the 2021 auction and visited the employee food shack, Tanner went to see Reed, who was working at the new rope gate. While Tanner was with Reed at the new rope gate, another employee of Jim's Auction asked Reed to run an errand at a different location on the auction grounds. Reed, in turn, asked Tanner to operate the rope gate while he ran the errand. Tanner did as Reed requested.

¶ 9    After Tanner had worked the rope gate for several minutes, a pickup truck pulling a flatbed trailer approached the rope gate. Tanner lowered the rope to allow the pickup to pass over it. As the pickup passed from the auction grounds onto the county road, the rope became entangled with the pickup truck and the rope wrapped

tightly around Tanner's left index and middle fingers, amputating them. Tanner's middle finger was later reattached.

## B. Procedural History

¶ 10 The Castles filed suit against Jim's Auction, asserting a single claim under the PLA and seeking damages for Tanner's injury. In the complaint, the Castles alleged that Tanner was an "invitee" under the PLA, and that Jim's Auction breached the duty it owed to him commensurate with that status.

¶ 11 The case proceeded to discovery, which included depositions of the Castles and Kearns. The parties agreed that Tanner was an invitee when he first entered the property the morning of February 8, 2021, because, among other things, he had a business purpose for attending the auction. The parties disagreed, however, on whether Tanner was still an invitee at the time he was injured while operating the rope gate. It was Jim's Auction's position that Tanner's status changed from invitee to licensee sometime prior to Tanner's injury. In accord with this position, Jim's Auction filed a C.R.C.P. 56(h) motion, seeking a pretrial determination as a matter of law that Tanner was a "licensee" under the PLA at the time he was injured. The Castles contested the motion, arguing that

Tanner was an "invitee" at all times, including at the time he was injured.

¶ 12   In their briefing, the parties concurred that the question of Tanner's status at the time of his injury was a question of law that the court could determine on the record before it.  At the parties' invitation, the court made the determination of Tanner's status at the time he was injured without a hearing.  After reviewing the parties' briefs, the attached documents (including affidavits and excerpts of deposition transcripts), the court file, and relevant authorities, the trial court determined that Tanner was a "licensee" as defined by the PLA at the time of his injury.

¶ 13   The case proceeded to a bench trial.  Given its pretrial determination that Tanner was a "licensee" at the time of his injury, the court considered only whether the Castles had proved that Jim's Auction was liable under a licensee theory of liability, which allows recovery for a defendant "landowner's unreasonable failure to exercise reasonable care with respect to dangers created by the landowner that the landowner actually knew about."  § 13-21-115(4)(b)(I), C.R.S. 2025.

¶ 14    In its written order following trial, the court concluded that while the proprietor of Jim's Auction had modified the rope gate in advance of the 2021 auction and "recognized that there was a *possibility* that the [modified] rope gate *could be* dangerous when used around moving vehicles improperly," "there was no compelling evidence that [Jim's Auction] had *actual knowledge* of the danger." (Emphasis added.)  The trial court also determined that the modified rope gate wasn't a "dangerous condition" and that Jim's Auction had not unreasonably failed to exercise reasonable care regarding the rope gate such that it could be held liable for injuries suffered by a mere licensee.  Consequently, the trial court dismissed the Castles' claim against Jim's Auction.

## II.    Analysis

¶ 15    On appeal, the Castles challenge the trial court's pretrial determination that Tanner was a "licensee" at the time of his injury, as well as its dismissal of their PLA claim against Jim's Auction. Because we conclude that the trial court erred in its pretrial determination that Tanner was a "licensee" at the time of his injury, we reverse both the trial court's pretrial determination and its

7

dismissal and remand the case for further proceedings consistent with this opinion.

¶ 16    We begin our analysis with an overview of the PLA and the applicable standard of review. We then turn to the facts as found by the trial court in its pretrial order and the conclusions it drew regarding Tanner's status based on those facts. Finally, we address the Castles' challenges to the trial court's determination that Tanner was a licensee and not an invitee.

### A.    The PLA and Our Standard of Review

¶ 17    The PLA seeks to "promote a state policy of responsibility by both landowners and those upon the land as well as to ensure that the ability of an injured party to recover is correlated with the injured party's status" at the time of injury. § 13-21-115(2)(a); *Legro v. Robinson*, 2015 COA 183, ¶ 19. The PLA distinguishes the duty of care that landowners owe to three different classifications of people on their land: "invitees," "licensees," and "trespassers." *See* § 13-21-115(4). A landowner owes the greatest duty of care to an "invitee," a lesser duty of care to a "licensee," and the lowest duty of

care to a "trespasser."[2]  *Wycoff v. Grace Cmty. Church of the Assemblies of God*, 251 P.3d 1260, 1265 (Colo. App. 2010).

¶ 18    The PLA defines "invitee" and "licensee" as follows:

> (a) "Invitee" means a person who enters or remains on the land of another to transact business in which the parties are mutually interested or who enters or remains on such land in response to the landowner's express or implied representation that the public is requested, expected, or intended to enter or remain.
>
> . . . .
>
> (c) "Licensee" means a person who enters or remains on the land of another for the licensee's own convenience or to advance the licensee's own interests, pursuant to the landowner's permission or consent.  "Licensee" includes a social guest.

§ 13-21-115(7).

¶ 19    The main distinction between an "invitee" and "licensee" turns on "whether the victim was on the premises 'to transact business in which the parties are mutually interested.'"  *Grizzell v. Hartman Enters., Inc.*, 68 P.3d 551, 553-54 (Colo. App. 2003) (quoting § 13-

---

[2] No party contends that Tanner was a trespasser at any time relevant to this case.  Accordingly, we don't discuss the definition of trespasser under the PLA or the limited duties that a landowner owes to a trespasser.  *See* § 13-21-115(4)(a), (7)(d), C.R.S. 2025.

21-115(5)(a), C.R.S. 2002 (current version at § 13-21-115(7)(a), C.R.S. 2025)). But the distinction between an "invitee" and a "licensee" also considers "whether that person's presence on the land was affirmatively invited or merely permitted" by the landowner. *Wycoff*, 251 P.3d at 1267. An invitee can also have an "implied invitation" to be on the premises based on the parties' prior custom, usage, or conduct. *See Corder v. Folds*, 2012 COA 174, ¶¶ 13-14.

¶ 20    Based on these distinctions, the PLA delineates the duty that a landowner owes to a "licensee" and an "invitee." A licensee's recovery is limited to damages caused

> (I) By the landowner's unreasonable failure to exercise reasonable care with respect to dangers created by the landowner that the landowner actually knew about; or

> (II) By the landowner's unreasonable failure to warn of dangers not created by the landowner that are not ordinarily present on property of the type involved and that the landowner actually knew about.

§ 13-21-115(4)(b). In contrast, an "invitee" may recover "for damages caused by the landowner's unreasonable failure to exercise reasonable care to protect against dangers the landowner

10

actually knew about *or should have known about.*" § 13-21-115(4)(c) (emphasis added).

¶ 21  A plaintiff's status isn't stagnant and can change at any time while on the landowner's property. *See Mathias v. Denv. Union Terminal Ry. Co.*, 323 P.2d 624, 626-27 (Colo. 1958) (discussing how plaintiff entered as an invitee but became a licensee when he entered an area not open to the public for his own benefit). "A plaintiff's status may change if he or she exceeds the scope of the landowner's invitation to access the property." *Warembourg v. Excel Elec., Inc.*, 2020 COA 103, ¶ 40.

¶ 22  When resolving a claim under the PLA, the court must determine as a matter of law whether the plaintiff, at the time of injury, was an "invitee," "licensee," or "trespasser." § 13-21-115(6). A trial court's determination of a plaintiff's status under the PLA is a mixed question of fact and law. *Reid v. Berkowitz*, 2013 COA 110M, ¶ 10. But because the trial court resolved the status question without a hearing, there are no findings of fact entitled to deference, and we are in the same position as the trial court. *See Sumerel v. Goodyear Tire & Rubber Co.*, 232 P.3d 128, 132–33 (Colo. App. 2009) (reviewing a trial court's determination de novo where

11

the trial court ruled without a hearing and "on the basis of the undisputed facts as set forth in the documentary evidence and the parties' affidavits"); *Bolser v. Bd. of Comm'rs*, 100 P.3d 51, 53 (Colo. App. 2004) ("[B]ecause the judgment here was entered based upon stipulated facts and documentary evidence, we are obligated to make an independent judgment on the merits.").  Accordingly, we review the trial court's status determination de novo based on the record that was before the court at the time it resolved the motion. *Cf. Medina v. State*, 35 P.3d 443, 452-53 (Colo. 2001) (Because the trial court "concluded that all relevant evidence had been presented and that the underlying facts were undisputed, the trial court made no findings of fact," and consequently, appellate review "is nothing more than statutory interpretation, which is a question of law . . . which we therefore review de novo."); *Legro*, ¶ 15 (When reviewing a trial court's PLA status determination, "we review de novo the court's application of the historical facts to the governing legal standards.").

¶ 23    Upon a party's C.R.C.P. 56(h) motion for the determination of a question of law, a court may enter an order deciding a legal question "[i]f there is no genuine issue of any material fact

12

necessary for the determination of the question of law." We review a court's disposition of a C.R.C.P. 56(h) motion de novo. *Legro*, ¶ 16.

¶ 24    With these principles in mind, we first turn to the facts before and the findings of the trial court, followed by the Castles' challenge to the trial court's determination that Tanner was a licensee at the time he suffered his injury.

B.    Trial Court's Determination of Tanner's Status Under the PLA

1.    Facts Before the Trial Court When it Entered the Pretrial Order

¶ 25    The undisputed facts giving rise to the events on February 8, 2021, as alleged by the parties in their briefing on the C.R.C.P. 56(h) motion and the attached exhibits, are as follows:

- When Tanner arrived at the auction grounds, he intended to purchase a vehicle during the auction and therefore entered the premises as an "invitee" as defined by the PLA.

- Tanner performed various tasks during the 2021 auction, including running tickets for sales, setting out trash

cans, and helping his father start vehicles for the auction.[3]

- On February 8, 2021, after helping his father start vehicles for the auction, Tanner got a breakfast burrito from the employee food shack while he waited for the truck he was interested in bidding on to come up for auction.

- After getting a breakfast burrito, Tanner socialized with two of Jim's Auction's employees near the auction office.

- The rope gate was located near the auction office in an area accessible to the public.

- The rope gate was in an area on the auction grounds that provided an exit to auction attendees who had purchased an item.

---

[3] Although Kearns states in his deposition testimony that Tanner didn't help Jared start vehicles for the auction on February 8, both Tanner and Jared independently testified in their depositions that Tanner helped start tractors at the 2021 auction, and the trial court stated in its pretrial order that "Tanner helped his father start-up vehicles before the auction." A definitive resolution of this apparently disputed fact isn't material to our resolution of the issues presented in this appeal.

- Reed, Tanner's cousin, was hired by Jim's Auction to work during the 2021 auction.

- Reed was operating the rope gate when Tanner greeted him on the morning of February 8, 2021.

- Shortly after Tanner greeted Reed, another employee of Jim's Auction asked Reed to run a work-related errand elsewhere on the auction grounds — namely, to take toilet paper to the porta-potties.

- Reed asked Tanner if he would watch the gate while Reed dealt with the errand.

- Tanner had operated the rope gate at Jim's Auction in the past.[4]

- Tanner was seriously injured while operating the rope gate at the 2021 auction.

---

[4] In the depositions relied upon during the C.R.C.P. 56(h) motion stage, there is discussion about Tanner having operated the rope gate during the "2019 auction." However, it was later clarified (and the parties agree) that Tanner operated the rope gate during the 2020 auction, not the 2019 auction. Accordingly, we treat the record references to Tanner operating the rope gate during the 2019 auction as references to him doing so during the 2020 auction.

### 2. The Trial Court's Conclusion Regarding Tanner's Status Under the PLA

¶ 26 Based on the facts as averred by the parties, the trial court determined that while Tanner arrived at the 2021 auction on February 8 as an "invitee," Tanner's status changed to that of a "licensee" before he was injured while operating the rope gate.

¶ 27 In its pretrial C.R.C.P. 56(h) order, the trial court provided three reasons for its determination that Tanner's status had changed prior to the accident: (1) after Tanner had finished helping his father start vehicles for the auction but before Tanner went to operate the rope gate, Tanner left the auction area and went to another part of the property to eat and socialize with employees of Jim's Auction (at which point he became a licensee); (2) Tanner volunteered to operate the rope gate without permission from Jim's Auction and, in doing so, exceeded the scope of his initial invitation; and (3) Tanner didn't have an implied invitation to operate the rope gate because there wasn't evidence in the record that Jim's Auction "routinely expected [Tanner] to manage the rope gate."

### C. The Castles' Challenges to the Court's Determination of Tanner's Status at the Time of His Injury

¶ 28    We now turn to an analysis of each of the Castles' contentions on appeal. The Castles advance three reasons that the trial court erred: (1) the auction was open to the public and the rope gate was within the auction's public boundaries; (2) Tanner was at the auction to bid on a vehicle and therefore had a mutually beneficial business purpose on the premises; and (3) Tanner was performing work for Jim's Auction at the time of his injury. We agree with all three of the Castles' contentions and therefore also agree that, based on the record before the trial court when it determined Tanner's status, it erred by concluding that he was a licensee at the time of his injury.

### 1. The Auction Was Open to the Public and the Rope Gate Was Within the Auction's Public Boundaries

¶ 29    The Castles first contend that the trial court erred by classifying Tanner as a "licensee" at the time of his injury because the auction was open to the public and Tanner always remained within the auction's public boundaries, including when he operated the rope gate. We agree that these facts support a determination that Tanner was an invitee at the time of his injury.

¶ 30    In its pretrial order, the court, citing *Lakeview Associates, Ltd. v. Maes*, 907 P.2d 580, 586 (Colo. 1995), relied on the undisputed fact that, after Tanner finished helping his father start vehicles, "Tanner left the auction area and went to over to another part of the property to socialize with some of Defendant's employees" to determine that Tanner exceeded the scope of his initial invitation and was thus no longer an "invitee" but a "licensee" at the time of injury. We disagree with the trial court's analysis because the record establishes that Tanner always remained in an area open to the public while on the auction grounds, including when he went to the food shack, socialized with Jim's Auction employees near the food shack, and greeted Reed at the rope gate.

¶ 31    Accordingly, we reject the trial court's conclusion that Tanner exceeded his initial invitation by leaving the auction area because he never went "upon areas of property outside the boundaries of the property onto which [he] initially had been invited." *Id.*

### 2. Tanner Entered and Remained on the Premises to Buy a Vehicle

¶ 32    The Castles next argue that the trial court erred by classifying Tanner as a "licensee" at the time of his injury because Tanner

18

remained on the premises to purchase a vehicle and therefore met the definition of an "invitee" under the PLA. We agree that this fact too supports that Tanner was an invitee at the time of his injury.

¶ 33 In its pretrial order, the trial court acknowledged that it was undisputed by the parties that Tanner entered the premises as an "invitee" because he intended to buy a vehicle on the premises. As discussed, however, the trial court determined that Tanner's status changed because he was "not invited onto the property to operate the rope gate" and thus exceeded his initial invitation by leaving the auction area and by volunteering to operate the rope gate.

¶ 34 By definition, the PLA classifies an "invitee" as anyone "who enters *or remains* on the land of another to transact business in which the parties are mutually interested or who enters or remains on such land in response to the landowner's express or implied representation that the public is requested, expected, or intended to enter or remain." § 13-21-115(7)(a) (emphasis added). On the other hand, the PLA defines a "licensee" as any "person who enters or remains on the land of another for the licensee's *own convenience or to advance the licensee's own interests,* pursuant to the landowner's permission or consent." § 13-21-115(7)(c). It is undisputed that

19

Tanner not only entered but also remained at the 2021 auction to buy a vehicle and had not yet completed that transaction when he was injured.

¶ 35    Notwithstanding this undisputed evidence, the trial court reasoned that by operating the rope gate at Reed's request, Tanner was, at least in part, advancing his own interests because he did so out of a desire to "further[] his interpersonal relationship with his older cousin" — in other words, "to be in [Reed]'s good graces."  This notion that Tanner operated the rope gate at Reed's request in order to ingratiate himself with Reed enjoys no record support.  Instead, all that the record establishes is that Reed was an employee of Jim's Auction and that, after being asked to run a work-related errand, he asked Tanner to assume the work-related task he had been performing.  Simply put, nothing in the record suggests that by acceding to Reed's request, Tanner was somehow advancing his own interests.

¶ 36    Accordingly, the fact that Tanner remained on the premises to purchase a vehicle — particularly when paired with the fact, as discussed below, that Tanner's initial invitation included the performance of miscellaneous "job duties" — leads us to the

20

opposite conclusion than that reached by the trial court regarding Tanner's status as it existed at the time of his injury.

### 3. Tanner's Initial Invitation Included Performing "Job Duties" at the 2021 Auction and Tanner Had an Implied Invitation to Operate the Rope Gate

¶ 37 The Castles next argue that the trial court erred by classifying Tanner as a "licensee" because, in addition to attending to bid on a vehicle, Tanner had entered the premises to work at the 2021 auction, which is what he was doing at the time of his injury. We agree that the trial court erred because (1) Tanner's initial invitation included performing other miscellaneous "job duties" on the premises, and (2) the evidence doesn't support that Tanner exceeded the scope of that invitation by operating the rope gate.

#### a. Tanner's Initial Invitation onto the Premises Included Performing Miscellaneous "Job Duties"

¶ 38 The parties don't dispute that the scope of Tanner's invitation reached beyond simply bidding on a vehicle and included performing at least *some* tasks for the benefit of Jim's Auction. Indeed, in its pretrial order, the trial court explicitly acknowledged that Tanner helped his father start vehicles for the auction and that

21

preparing those vehicles for the auction was part of Tanner's initial invitation.

¶ 39    The record also establishes that Tanner's initial invitation onto the premises also included performing other miscellaneous "job duties" at the auction, including running tickets and putting out trash cans, and that Tanner completed some of these "job duties" alongside Kearns.  According to the record before the court at the time it entered its pretrial order, Kearns was "happy" with how Tanner performed these "job duties" at the 2021 auction.

¶ 40    In its pretrial order, the trial court made no mention of Tanner's additional "job duties," how these duties related to Tanner's initial invitation onto the premises, whether Tanner's initial invitation included the performance of these miscellaneous "job duties," or why the rope gate was somehow a distinguishable duty from the other "job duties" Tanner performed with Kearns' blessing at the 2021 auction.  If Tanner didn't exceed the scope of his invitation by performing the various minor tasks, we fail to see how operating the rope gate did.  There is simply no coherent basis for reaching such a conclusion.

22

¶ 41    Accordingly, on the undisputed facts in the record as they existed during the C.R.C.P. 56(h) motion stage, there is no basis to conclude that Tanner's initial invitation didn't include performing miscellaneous "job duties" at the auction or that the operation of the rope gate was somehow off limits.

### b.    Tanner Wasn't a Volunteer at the Time of His Injury Because He Had an Implied Invitation to Operate the Rope Gate

¶ 42    In its pretrial order, the only distinction the trial court seemed to draw between Tanner's operation of the rope gate and his time helping his father start vehicles and performing other "job duties" for the auction was that Tanner "volunteered" to operate the rope gate without permission from Jim's Auction.  Relying on *Rieger v. Wat Buddhawararam of Denver, Inc.*, 2013 COA 156, ¶ 21, the trial court determined that Tanner's status changed before his injury because "a volunteer occupies roughly the same position as an implied licensee."  We conclude that this was error.

¶ 43    While "volunteers are generally classified as licensees," *Grizzell*, 68 P.3d at 554, we aren't persuaded that Tanner was merely a volunteer when he agreed to operate the rope gate because the undisputed facts establish that Tanner had an implied

23

invitation to operate the rope gate based on the parties' previous conduct. We reach this conclusion for three reasons.

¶ 44 First, as discussed and as observed by the trial court, Tanner was performing other "job duties" at the 2021 auction with Kearns' knowledge. And there is no principled distinction between the miscellaneous "job duties" Tanner performed with Kearns' authorization and Tanner's operation of the rope gate.

¶ 45 Second, the record before the court when it resolved the Rule 56(h) motion established that Tanner had worked the rope gate for three days during the 2020 auction. This course of conduct reflects a custom between the parties giving rise to an implied invitation for Tanner to operate the rope gate on February 8. *See Corder*, ¶ 17 ("[A] landowner may consent to entry, absent express words, by his or her course of conduct.").

¶ 46 Third, the record establishes that Kearns never expressed to anyone that he didn't want Tanner working at the rope gate at the 2021 auction, so any implied invitation that existed wasn't revoked before Tanner's injury.

¶ 47 Nevertheless, in its pretrial order, the trial court determined that an implied invitation for Tanner to work the rope gate didn't

24

exist because "there is no evidence that Tanner was routinely expected to manage the rope gate" and Tanner had only "briefly operated the rope gate in the past." These observations by the trial court miss the mark. The record establishes that the auction only lasts three days each year and that Tanner operated the rope gate on all three days of the 2020 auction season. We disagree with the trial court that the parties' conduct didn't establish a custom that it was okay for Tanner to work the rope gate at the 2021 auction given the frequency with which Tanner had operated the rope gate during the prior year's auction and the concession by Kearns that he never expressed any concern over Tanner's continuing to do so.

¶ 48 Simply put, the record before the trial court when it resolved the C.R.C.P. 56(h) motion doesn't support that Tanner "volunteered"

to operate the rope gate, exceeded his initial invitation by operating the rope gate, or lacked an implied invitation to do so.[5]

### 4. Conclusion

¶ 49 Because the record establishes that Tanner was an "invitee" at the time of his injury, we reverse the trial court's pretrial determination that Tanner was a "licensee" at the time of his injury. On remand, the trial court must reconsider the Castles' PLA claim against Jim's Auction, this time on the basis that Tanner was an invitee at the time of his injury.

---

[5] On appeal, the Castles also contend that the trial court incorrectly determined Tanner was a "licensee" at the time of his injury because Tanner operated the rope gate at the specific direction of Reed, an employee of Jim's Auction. During the C.R.C.P. 56(h) motion stage, the Castles raised this argument in their response, but Jim's Auction didn't address this argument in its reply, nor did the trial court make any determination regarding this point in its pretrial order. In the trial court's final judgment, the trial court found that there wasn't any persuasive evidence that Reed had the authority from Jim's Auction to authorize Tanner to work the rope gate. But this evidence from trial is outside of the scope of the record that pertains to the trial court's pretrial order, and because we have already addressed why Tanner had an implied invitation from Jim's Auction to operate the rope gate and that his initial invitation onto the premises included the performance of miscellaneous "job duties" around the auction grounds, we decline to address this issue further.

¶ 50     Because we reverse the trial court's initial determination that Tanner was a licensee at the time of his injury, we don't address the Castles' second argument that the trial court clearly erred in concluding that Jim's Auction lacked actual knowledge of the dangerous condition, as such a finding isn't required to impose liability for an injury suffered by an invitee.  *Compare* § 13-21-115(4)(b)(I), *with* § 13-21-115(4)(c)(I).  Because the parties tried the case based on the erroneous pretrial ruling that Tanner was a licensee and not an invitee, the court may permit the parties to present additional evidence on remand, in addition to considering the evidence previously presented.

### III.     Disposition

¶ 51     For the reasons set forth above, the trial court's pretrial "licensee" determination and dismissal of the Castles' PLA claim against Jim's Auction are reversed and the case is remanded for further proceedings consistent with this opinion.

JUDGE BROWN and JUDGE MOULTRIE concur.